KENNETH ROBINSON, AN INFANT, BY HIS PARENT AND
GUARDIAN AD LITEM, ERNESTINE ROBINSON, ET AL.,
PLAINTIFFS-RESPONDENTS, v. WILLIAM T. CAHILL,
GOVERNOR OF THE STATE OF NEW JERSEY, ET AL.,
DEFENDANTS-APPELLANTS.

Argued January 9, 1973—Decided April 3, 1973.

474

476

478

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellants (*Mr. Stephen G. Weiss,* Special Counsel; *Mr. David S. Litwin* and *Ms. Mary Ann Burgess,* Deputy Attorneys General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Harold J. Ruvoldt, Jr.,* argued the cause for respondents (*Messrs. Ruvoldt and Ruvoldt,* attorneys, Special Counsel to *Mr. Samuel A. Scott,* Corporation Counsel of the City of Jersey City, *Mr. William A. Drier,* Corporation Counsel of the City of Plainfield, *Mr. Joseph A. LaCava,* Corporation Counsel of the City of Paterson, and *Mr. Julius Fielo,* Corporation Counsel of the City of East Orange).

*Mr. Paul Tractenberg* and *Mr. David G. Lubell,* of the New York bar, argued the cause for *amici curiae* Education Committee, Newark Chapter, National Association for the Advancement of Colored People and American Civil Liberties Union of New Jersey (*Ms. Mary K. O'Melveny,* of the New York bar, of counsel; *Mr. William J. Bender* and *Mr. Frank Askin,* attorneys).

*Mr. Arthur J. Sullivan, Jr.,* argued the cause for *amici curiae* City of Clifton and William Holster.

*Mr. William H. Hyatt, Jr.,* argued the cause for *amicus curiae* Permanent Commission on State School Support (*Messrs. Pitney, Hardin and Kipp,* attorneys).

*Mr. Melville D. Miller, Jr.,* argued the cause for *amicus curiae* New Jersey State Office of Legal Services.

· The opinion of the Court was delivered by

WEINTRAUB, C. J. This case involves the constitutionality of statutes providing for the financing of elementary and secondary schools. The trial court found the existing system discriminates against students in districts with low real property ratables and also discriminates among taxpayers by imposing unequal burdens. These discriminations· were held to violate the equal protection mandates of the Federal and State Constitutions. They were held also to violate other provisions of the State Constitution relating to public education and to the assessment of real property for ·taxa-ı tion, to which we will refer later. The conclusion was that the State must finance the system out of State revenues raised by levies imposed uniformly on taxpayers of the same class. The holding was prospective only, and judicial relief was withheld until January 1, 1974 to permit the Legislature to adopt another plan, with the proviso that if a proper plan is not enacted by January 1, 1973, certain State moneys appropriated for distribution to school districts shall be distributed in harmony with the opinion rather than according to the statute's terms. 118 *N. J. Super.* 223 (Law Div. 1972).

We certified the appeals before argument in the Appellate Division and stayed the operation of the judgment until our further order.

The system of meeting the current costs of our public schools is described in the trial court's opinion, 118 *N. J. Super.* at 228–231, and need not be repeated other than in its broad outlines. The funds are derived from three sources: local *ad valorem* taxation of real property, State aid, and federal aid. The trial court found that local taxes currently yielded 67% of the statewide total of operating expenses, State aid yielded 28% and federal aid the balance of 5%. 118 *N. J. Super.* at 231.

It is agreed there is a disparity in the number of dollars spent per pupil, depending upon the district of residence. As to the local property tax, the base is the taxable real property within the several districts, and of course the amount of taxable real property within a district is not related to the number of students within it. Although there is no statutory maximum upon the local tax for current educational expenses, there are practical limitations arising from the demands for other local services upon the same tax base. And it is clear also that State aid does not operate substantially to equalize the sums available per pupil.

There was testimony with respect to the correlation between dollar input per pupil and the end product of the educational process. Obviously equality of dollar input will not assure equality in educational results. There are individual and group disadvantages which play a part. Local conditions, too, are telling, for example, insofar as they attract or repel teachers who are free to choose one community rather than another. But it is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity. And of course the Legislature has acted upon that premise in providing State aid on formulas designed to ameliorate in part the dollar disparities generated by a system of local taxation. Hence we accept the proposition that the quality of educational opportunity does depend in substantial measure upon the number of dollars invested, notwithstanding that the impact upon students may be unequal because of other factors, natural or environmental.

We accept also the trial court's findings of fact with respect to the existing disparities in expenditures per pupil, and we agree that the present situation cannot be reconciled with relevant constitutional requirements. But we do not accept the constitutional thesis expounded by the trial court. That thesis has implications beyond the subject of public education, and bears also upon the options available to the

Legislature in meeting the State's obligation with respect to that specific subject matter.

I

We will consider first whether the equal protection clause of the Fourteenth Amendment and the equal protection provision implicit in *Art.* I, ¶ 1, of our State Constitution of 1947, *Bailey v. Engelman,* 56 *N. J.* 54, 55 (1970), reach our statutory scheme. It is urged, and the trial court agreed, that equal protection was denied both the students and the local taxpayers.

It must be evident that the rudimentary scheme of local government is implicated by the proposition that the equal protection clause dictates statewide uniformity. *West Morris Regional Board of Education v. Sills,* 58 *N. J.* 464, 477 (1971), *cert.* denied 404 *U. S.* 986, 92 S. Ct. 450, 30 *L. Ed.* 2d 370 (1971) ; see *James v. Valtierra,* 402 *U. S.* 137, 142–143, 91 S. Ct. 1331, 1334, 28 *L. Ed.* 2d 678, 683 (1971). This is so unless it can be said that the equal protection clause holds education to be a thing apart from other essential services which also depend upon local legislative decision with respect to the dollar amount to be invested. As to any service to which equal protection is found to apply, it would follow that if the moneys are raised by local taxation in a way which permits a different dollar expenditure per affected resident, the program is invalid as to the beneficiaries unless a State aid program fills in the gap. It would then follow that a State aid program which did not neutralize local inequalities would itself deny equal protection as to beneficiaries; and although it is not urged upon us that every federal statute must abide by that precept, we see no reason why that constitutional mandate would not also prevail at the federal level if the basic premise

is sound.[1] Thus a federal program which provides funds on a matching or conditional basis with State or local option to participate or to choose a level of participation would be invidious as to those unequally benefited. That of course has not been the prevalent assumption. See statutes involved in *Charles C. Steward Machine Co. v. Davis,* 301 *U. S.* 548, 57 S. Ct. 883, 81 *L. Ed.* 1279 (1937); and *James v. Valtierra, supra,* 402 *U. S.* 137, 91 S. Ct. 1331, 28 *L. Ed.* 2d 678. With respect to the categorical welfare programs under the Social Security Act which deal with the most basic need of food and shelter, the federal legislation does not comport with the constitutional standards we are asked to find. Although local option permitted by the statute was an underlying fact in the decisions of the United States Supreme Court, the Court did not intimate that local option generates a constitutional problem. See *King v. Smith,* 392 *U. S.* 309, 318–319, 88 S. Ct. 2128, 2133–2134, 20 *L. Ed.* 2d 1118, 1126 (1968); *Rosado v. Wyman,* 397 *U. S.* 397, 407–408, 90 S. Ct. 1207, 1215–1216, 25 *L. Ed.* 2d 442, 453 (1970); *Dandridge v. Williams,* 397 *U. S.* 471, 90 S. Ct. 1153, 25 *L. Ed.* 2d 491 (1970); see also *Bailey v. Engelman, supra,* 56 *N. J.* 54, 57, and *Motyka v. McCorkle,* 58 *N. J.* 165, 169 (1971).

The Court of Appeals for the Second Circuit recently rejected sundry constitutional challenges to the welfare programs under the Social Security Act. The plaintiffs there contended that the federal government, having entered the field, was obliged to assume the entire cost of welfare, and that in any event due process and equal protection were

---

[1]The concept of equal protection antedates the Fourteenth Amendment. It is implicit in a democratic form of government. The Declaration of Independence proclaimed that "All men are created equal," which must mean equality at the hands of government. There inheres in the due process clause of the Fifth Amendment a guarantee of equal protection; it prohibits unjustifiable discrimination by the Congress. Shapiro v. Thompson, 394 *U. S.* 618, 641–642, 89 S. Ct. 1322, 1335, 22 *L. Ed.* 2d 600, 619 (1969).

denied because the federal contribution to the States was made under a formula based upon per capita income of the States rather than the number of persons in need. *City of New York v. Richardson,* 473 *F.* 2d 923 (2 Cir. 1973). Those propositions were rejected but that litigation suggests the distance the judiciary would travel if it found the Constitution dictated such single answers to the myriad, complex problems of today.

In *West Morris Regional Board of Education v. Sills, supra,* 58 *N. J.* 464, we dismissed a claim that the equal protection clause of the Fourteenth Amendment was offended by a statute providing for transportation of only those students at private schools who resided in school districts which furnished such transportation to public schools. We said "at least as of now, * * * there is no constitutional fiat that educational expenditures be identical for all students throughout the State" (*p.* 478). We thus read the decisions of the United States Supreme Court. We recognized that "It, of course, would be another matter, if local option were designed for an invidious end, such as racial discrimination" (*p.* 478), and cited in that regard *Griffin v. County School Board of Prince Edward County,* 377 *U. S.* 218, 84 S. Ct. 1226, 12 *L. Ed.* 2d 256 (1964), and other cases.

The lead case finding that the federal equal protection clause requires statewide equality of expenditure per pupil is *Serrano v. Priest,* 5 *Cal.* 3d 584, 96 *Cal. Rptr.* 601, 487 *P.* 2d 1241 (Sup. Ct. 1971). In finding that the Fourteenth Amendment applied, *Serrano* distinguished *McInnis v. Shapiro,* 293 *F. Supp.* 327 (N. D. Ill. 1968), affirmed *sub nom. McInnis v. Ogilvie,* 394 *U. S.* 322, 89 S. Ct. 1197, 22 *L. Ed.* 2d 308 (1969), and *Burruss v. Wilkerson,* 310 *F. Supp.* 572 (W. D. Va. 1969), affirmed 397 *U. S.* 44, 90 S. Ct. 812, 25 *L. Ed.* 2d 37 (1970). In *McInnis* and in *Burruss* three-man courts rejected equal protection attacks upon State school systems in which, as in the case before us, the expenditures per pupil varied because of local de-

cision. The United States Supreme Court · affirmed without discussion. *Serrano* found those cases to be different, saying the contention there rejected was that equal protection required equality measured by the *needs* of pupils. That standard, *Serrano* said, would be judicially unmanageable, whereas equality of *dollar input,* the standard *Serrano* accepted, would present no such problem of judicial management and therefore was beyond the holding of *McInnis* and *Burruss.*[2]

Plaintiffs seek to bring this case within the doctrine, summed up in *Goosby v. Osser,* 409 *U. S.* 512, 93 S. Ct. 854, 859, 35 *L. Ed.* 2d 36 (1973), that there must be applied "the more stringent compelling state interest test when either a fundamental right, such as the right to vote,[3] was allegedly infringed, *Reynolds v. Sims,* 377 *U. S.* 533, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) ; *Harper v. Virginia Board of Elections,* 383 *U. S.* 663, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966) ; *Carrington v. Rash,* 380 *U. S.* 89, 85 S. Ct. 775, 13 L. Ed. 2d 675 (1965), or when the statutory classifications were drawn on the basis of suspect criteria, such

---

[2]*Askew v. Hargrave,* 401 *U. S.* 476, 91 S. Ct. 856, 28 *L. Ed.* 2d 196 (1971), recognizes a potential for an equal protection complaint in this area. There the Florida statute provided that no State aid for education could be had if the *ad valorem* tax levied in a county for education *exceeded* a stated millage rate. A three-man court found the restriction, based as it was on amount of ratables without regard to the number of pupils, was "irrational," noting that it *"prevents* the *local Boards* from adequately financing their children's education." *Hargrave v. Kirk,* 313 *F. Supp.* 944, 949 (M. D. Fla. 1970). The Supreme Court vacated the judgment, saying the federal court should abstain until a pending attack in the State courts on State grounds is resolved, and adding that if the federal issue is thereafter reached, consideration should be given to the defense contention that the State's infusion of funds more than compensated for the loss of revenue caused by the limitation on the millage rate in the counties.

[3]We note that shortly after *Goosby v. Osser,* the Supreme Court decided *Mahan v. Howell,* —— *U. S.* ——, 93 S. Ct. 979, 35 *L. Ed.* 2d 320 (1973), which involved apportionment of a State legislature. The majority opinion applied the "rational basis" test.

as wealth or race, *Harper v. Virginia Board of Elections, supra; McLaughlin v. Florida,* 379 *U. S.* 184, 192, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964); *Douglas v. California,* 372 *U. S.* 353, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963)." Plaintiffs say that there is a "fundamental right" to education. They contend also that the statutory scheme results in a classification on the basis of "wealth" because the total of the taxable ratables within a school district plays at least a practical role in determining the dollar expenditure per pupil. Upon the premise that education is a "fundamental right" and upon the alternate premise that the statutes operate to place pupils in classes upon the basis of "wealth," plaintiffs say there must be a "compelling state interest" to support that classification and that the state interest is not "compelling."

## A.

After this opinion was prepared the United States Supreme Court decided *San Antonio Independent School District v. Rodriguez,* —— *U. S.* ——, 93 S. Ct. 1278, 35 *L. Ed.* 2d —— (1973). By a vote of 5 to 4 the Court reversed the district court's judgment which, following the lead of *Serrano,* had held the Texas statute denied school children equal protection of the law in violation of the Fourteenth Amendment. 337 *F. Supp.* 280 (W. D. Tex. 1972). The majority of the Supreme Court found the compelling state interest test did not apply, and that, measured by the conventional rational basis test, the Texas scheme was valid.

In holding the compelling state interest test did not apply, the majority concluded the Texas statute did not discriminate among children on the basis of wealth, and that the statute did not involve a "fundamental" right. The Supreme Court thus rejected both of the predicates for invoking the compelling state interest standard of review and the close scrutiny approach which that concept purports to involve.

With respect to the alleged classification on the basis of wealth, the majority found no ground in fact for the claim, saying (93 S. Ct. at 1292):

"For these two reasons — the absence of any evidence that the financing system discriminates against any definable category of "poor" people or that it results in the absolute deprivation of education — the disadvantaged class is not susceptible to identification in traditional terms."

The majority rejected the claim that because there were disparities in the taxable wealth of the districts, it followed there was discrimination against the residents of the less affluent districts. The majority stated its view this way (93 S. Ct. at 1294):

"However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."

With respect to the alternate contention that education is a "fundamental" right within the compelling interest test, the majority pointed out that the equal protection clause did not itself generate substantive rights and thereupon assure equality with respect to them. The majority noted that the Federal Constitution did not explicitly or implicitly guarantee a right to education, and rejected a dissenting view that education nonetheless be deemed a fundamental right on the thesis that it serves a satellite role essential for the exercise of the First Amendment freedoms and of the right to vote. The majority added that in any event there was no proof that the Texas system "fails to provide each child with an opportunity to acquire the basic minimal

skills necessary for the enjoyment of the rights of speech and of full participation in the political process" (93 S. Ct. at 1299).

Turning to the question whether the system "with its conceded imperfections, nevertheless bears some rational relationship to a legitimate state purpose" (93 S. Ct. at 1302), the majority found the Texas system could not be said to deny equal protection. In essence the majority found that the State's dollar contribution "was designed to provide an adequate minimum educational offering in every school in the State" (93 S. Ct. at 1303); that the design was such that "each district would have some ability to provide a more enriched educational program"; and that "the primary distinguishing attributes of schools in property-affluent districts are lower pupil-teacher ratios and higher salary schedules" (93 S. Ct. at 1303). The majority concluded it was rational for a State to call upon the local government to participate in this way in the rendition of this public service.

The majority of course did not say there could never be a successful equal protection attack in this area. Indeed, in footnote 107, the majority, speaking of Mr. Justice White's dissent, recognized that if a statute imposed a ceiling which barred desired tax increases in a district, there would be an arguable issue, the majority referring to *Hargrave v. Kirk* which we discussed in our footnote 2 above. And it must be recognized that the Texas system did not depend as heavily as ours upon the local tax effort. Texas contributed 50% of the total statewide current costs, the federal government contributed 10% and the local districts the remaining 40%. This contrasts with our scene, in which the local districts carry 67% of the total load with the State contributing but 28%. Further, the Texas statute stated minimum attributes for an educational opportunity and those attributes were met by the State's own contribution.[3a] But despite

3aThe opinion reads (93 S. Ct. 1303):
"The State's contribution, under the Minimum Foundation Program, was designed to provide an adequate minimum educational offering

these differences, we do not believe the majority would find a federal constitutional flaw in the case before us.

The majority recognized, as we have in this opinion, that the equal protection argument goes beyond the educational scene and implicates the entire concept of local government with local fiscal responsibility, saying (93 S. Ct. at 1307):

"Appellees further urge that the Texas system is unconstitutionally arbitrary because it allows the availability of local taxable resources to turn on 'happenstance.' They see no justification for a system that allows, as they contend, the quality of education to fluctuate on the basis of the fortuitous positioning of the boundary lines of political subdivisions and the location of valuable commercial and industrial property. But any scheme of local taxation — indeed the very existence of identifiable local governmental units — requires the establishment of jurisdictional boundaries that are inevitably arbitrary. It is equally inevitable that some localities are going to be blessed with more taxable assets than others. Nor is local wealth a static quantity. Changes in the level of taxable wealth within any district may result from any number of events, some of which local residents can and do influence. For instance, commercial and industrial enterprises may be encouraged to locate within a district by various actions — public and private.

Moreover, if local taxation for local expenditure is an unconstitutional method of providing for education then it may be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such a severe denigration of local property taxation and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live."

---

in every school in the State. Funds are distributed to assure that there will be one teacher — compensated at the state-supported minimum salary — for every 25 students. Each school district's other supportive personnel are provided for: one principal for every 30 teachers; one 'special service' teacher — librarian, nurse, doctor, etc.—for every 20 teachers; superintendents, vocational instructors, counselors, and educators for exceptional children are also provided. Additional funds are earmarked for current operating expenses, for student transportation, and for free textbooks."

In footnote 110, the majority added that 'This Court has never doubted the propriety of maintaining political subdivisions within the States and has never found in the Equal Protection Clause any *per se* rule of 'territorial uniformity.' " (Citing cases.)

There emerges from the majority opinion an evident reluctance to say the Federal Constitution supplies single solutions by which all the States are bound. Although obviously not applauding the existing scene, the majority would leave the problem to the processes of the several States. In their words (93 S. Ct. at 1309):

> "The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand. We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative new thinking as to public education, its methods and its funding, is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them."

 The question whether the equal protection demand of our State Constitution is offended remains for us to decide. Conceivably a State Constitution could be more demanding. For one thing, there is absent the principle of federalism which cautions against too expansive a view of a federal constitutional limitation upon the power and opportunity of the several States to cope with their own problems in the light of their own circumstances. The majority in *Rodriguez* expressly noted that "every claim arising under the Equal Protection Clause has implications for the relationship between national and state power under our federal system," adding that "it would be difficult to imagine a case having a greater potential impact on our federal system than the

one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State" (93 S. Ct. at 1302).

We go then to the question whether our State guarantee of equal protection is offended. In preparing this opinion before the decision in *Rodriguez,* we considered both the federal and state equal protection issues in terms of the compelling state interest doctrine, because the doctrine could not be ignored on the federal issue and because the parties presented the State constitutional issue in the same terms. That portion of our opinion (Point IB below) remains adequate with respect to the State equal protection issue and hence we have not altered it. We should not be understood, because of our treatment of the State equal protection issue in those terms, to embrace that doctrine in the application of the State equal protection issue.

In passing we note briefly the reason why we are not prepared to accept that concept for State constitutional purposes. We have no difficulty with the thought that a discrimination which may have an invidious base is "suspect" and will be examined closely. And if a discrimination of that kind is found, the inquiry may well end, for it is not likely that a State interest could sustain such a discrimination. But we have not found helpful the concept of a "fundamental" right. No one has successfully defined the term for this purpose. Even the proposition discussed in *Rodriguez,* that a right is "fundamental" if it is explicitly or implicitly guaranteed in the Constitution, is immediately vulnerable, for the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment. And if a right is somehow found to be "fundamental," there remains the question as to what State interest is "compelling" and there, too, we find little, if any, light. Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the

meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. See, for example, *Jones v. Falcey*, 48 *N. J.* 25, 39–40 (1966); *Independent Electricians and Electrical Contractors' Association v. New Jersey Board of Examiners of Electrical Contractors*, 48 *N. J.* 413, 423–427 (1967); *Jackman v. Bodine*, 55 *N. J.* 371, 382–383 (1970).

### B

We hesitate to turn this case upon the State equal protection clause. The reason is that the equal protection clause may be unmanageable if it is called upon to supply categorical answers in the vast area of human needs, choosing those which must be met and a single basis upon which the State must act. The difficulties become apparent in the argument in the case at hand.

We will consider first the claim that there is classification according to "wealth," then the claim that a "fundamental right" is involved, and finally the claim that no "compelling state interest" warrants the statutory treatment of the subject.

Wealth may or may not be an invidious basis for the imposition of a burden or for the enjoyment of a benefit. Wealth is not at all "suspect" as a basis for raising revenues. As to the taxpayer, classifications depend upon or reflect wealth except in the rare case of a head tax. Whether wealth is invidious in its impact upon the enjoyment of rights or benefits is a more complex question, but again it cannot be said to be "suspect" in all settings. Obviously financial lack is a laudable basis when a statute seeks to ameliorate poverty. On the other hand, a net worth or poll

tax requirement for voting is today[4] arbitrary. *Harper v. Virginia State Board of Elections,* 383 *U. S.* 663, 86 S. Ct. 1079, 16 *L. Ed.* 2d 169 (1966); see *Kramer v. Union Free School District,* 395 *U. S.* 621, 89 S. Ct. 1886, 23 *L. Ed.* 2d 583 (1969), and *Cipriano v. Houma,* 395 *U. S.* 701, 89 S. Ct. 1897, 23 *L. Ed.* 2d 647 (1969). We know this would be equally true if one's right to migrate were sought to be conditioned upon net worth. *Cf. Shapiro v. Thompson, supra,* 394 *U. S.* 618, 89 S. Ct. 1322, 22 *L. Ed.* 2d 600. We can be sure the result would be the same if the right to attend elementary or secondary schools was made to depend upon the net worth of the pupil or of his parents.

The Legislature of course has not conditioned attendance at elementary and secondary schools upon the net worth of the pupil or his parents or even on the payment of a fee. Nor has the Legislature mandated that local government shall limit its current expenditures on the basis of the amount of ratables. The most that can be said is that, the subject having been committed in part to local government, the sums made available for education by local taxation have been influenced by the size of the tax base available for all activities of local government and by the judgment of local authorities as to how much shall be raised for all local needs.

In this respect education is handled no differently than sundry other essential services which are supplied on that basis. A signal feature of home rule as we know it is that the residents of a political subdivision are permitted within substantial limits to decide how much to raise for services which are necessary or sufficiently desirable to justify the exertion of the taxing power. How much will be done by local government may, of course, depend upon the size of its tax base, which, as to local government, is substantially

---

[4]Our State Constitution adopted in 1776 had net worth requirements for voting (*Art.* IV) and for election to office (*Art.* III).

the value of its real property. It is inevitable that expenditures per resident will vary among municipalities, resulting in differences as to benefits and tax burden. If this is held to constitute classification according to "wealth" and therefore "suspect," our political structure will be fundamentally changed. It has always been assumed that "taxes in different taxing districts in the State need not be uniform" as among the districts. 1 *Cooley, Taxation* (Nichols, 4th ed. 1924) § 313, *p.* 649.

The other basis upon which plaintiffs seek to invoke the "compelling state interest" test is that education is a "fundamental right." The term "fundamental right" has not been defined. It is urged that education was so denominated in *Brown v. Board of Education,* 347 *U. S.* 483; 493, 74 S. Ct. 686, 691, 98 *L. Ed.* 873, 880 (1954), where the Court said that "Today, education is perhaps the most important function of state and local governments," and that "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." But it is perfectly clear that the issue in *Brown* was, in the Court's words, "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" (347 *U. S.* at 493, 74 S. Ct. at 691, 98 *L. Ed.* at 880.) In short, *Brown* turned upon invidious classification on the basis of race. The answer would have been the same no matter where public education stood in a scale of values, whether that right was "fundamental" or something below it. It is significant that the Supreme Court has never cited *Brown* as a case involving the "fundamental right" concept. Indeed the first excerpt just quoted from *Brown* would affirmatively point the other way if the "fundamental right" doctrine was in mind since education is there recognized to be a most important function of "local governments" as well as of the State.

This is not to say that public education is not vital. Of course it is. Rather we stress how difficult it would be to find an objective basis to say the equal protection clause selects education and demands inflexible statewide uniformity in expenditure. Surely no need is more basic than food and lodging. As we have already noted, the categorical assistance programs supported by federal aid have a large element of State option resulting in fact in different levels of assistance per recipient in this country. Despite the fact that welfare is so singularly important that the Supreme Court held that benefits could not be terminated without prior hearing, *Goldberg v. Kelly*, 397 *U. S.* 254, 90 S. Ct. 1011, 25 *L. Ed.* 2d 287 (1970), the Court, in dealing with an equal protection claim revolving about the amount of benefits, applied the conventional standard for decision, *i. e.*, the existence of a "rational" basis for the classification.[5] *Dandridge, supra,* 397

---

[5] In *Lindsey v. Normet*, 405 *U. S.* 56, 92 S. Ct. 862, 31 *L. Ed.* 2d 36 (1972), the attack was upon a special statutory provision relating to summary dispossess actions. The Court rejected the claim that because housing was involved, the right of the occupant was "fundamental" requiring a "compelling governmental interest" to support the special treatment of these possessory actions. In rejecting that claim, the Court said (405 *U. S.* at 74, 92 S. Ct. at 874, 31 *L. Ed.* 2d at 50–51):

"We do not denigrate the importance of decent, safe and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease, without the payment of rent or otherwise contrary to the terms of the relevant agreement. Absent constitutional mandate, the assurance of adequate housing and the definition of landlord-tenant relationships are legislative, not judicial, functions. Nor should we forget that the Constitution expressly protects against confiscation of private property or the income therefrom.

Since the purpose of the Oregon Forcible Entry and Detainer Statute is constitutionally permissible and since the classification under attack is rationally related to that purpose, the statute is not repugnant to the Equal Protection Clause of the Fourteenth Amendment."

*U. S.* at 483–487, 90 S. Ct. at 1160–1163, 25 *L. Ed.* 2d at 500–503. Essential also are police and fire protection, as to which the sums spent per resident vary with local decision. Nor are water and sundry public health services available throughout the State on a uniform dollar basis.

It is argued that if the State decides that a service shall be furnished, the service should thereby become one of "fundamental right." In this connection reference is made to our constitutional provision that "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *Art.* VIII, § 4, ¶ 1. Whether that provision itself assures to the student that there will be uniform dollar input or assures to the taxpayer that the tax base shall be statewide is another question dealt with below in Part II of this opinion. The proposition before us at the moment is that the equal protection clause takes over with that effect as to pupil or taxpayer or both because the obligation or responsibility is that of the State.

The trouble with that approach is that ultimately all services categorized as "governmental" (rather than "corporate") are furnished pursuant to the obligation of the State, the municipal corporation being the State's agency or arm to render the service on its behalf. *Bergen County v. Port of New York Authority,* 32 *N. J.* 303, 312–314 (1960) ; 56 *Am. Jur.* 2d, *Municipal Corporations,* § 23, *pp.* 87–88. A municipality has been described as "simply an agency of the state for conducting the affairs of government," *Atkin v. Kansas,* 191 *U. S.* 207, 221, 24 S. Ct. 124, 127, 48 *L. Ed.* 148, 157 (1903), as "merely a department of the state," *Trenton v. New Jersey,* 262 *U. S.* 182, 187, 43 S. Ct. 534, 537, 67 *L. Ed.* 937, 941 (1923). See also 1 *McQuillin, Municipal Corporations* (1971 rev. ed) § 1.58, *p.* 83, and § 2.08, *p.* 142; *Cooley, Constitutional Limitations* (3d ed. 1874) *240. In this regard, the local school

district is indistinguishable from other local governmental entities. As was said in *Landis v. Ashworth (School District No. 44),* 57 *N. J. L.* 509, 510 (Sup. Ct. 1895), in rejecting a claim that a school district could not tax:

"This contention seems to us not well founded. School districts are formed for the purpose of aiding in the exercise of that governmental function which relates to the education of children, and to that end the legal voters of each district are entrusted with specified powers of local government, and the trustees whom they elect are made a body corporate to represent the district and its inhabitants. These characteristics mark them as political organizations. * * * They were so regarded in *State v. Deshler,* 1 *Dutcher* (25 N. J. L.) 177, where Mr. Justice Elmer said: 'School districts are only smaller municipalities * * *.' "

It is in this frame of reference that it was said long ago that "All taxes, whether levied for state, county or municipal purposes, are state taxes — they can be imposed by no other authority than that of the state. The state appropriates the proceeds to what purposes it sees fit; but, however the proceeds may be appropriated, every tax is a state tax." *State Board of Tax Assessors v. Central R. R. Co.,* 48 *N. J. L.* 146, 280 (E. & A. 1886); *Camden & Amboy R. R. & Tr. Co. v. Commissioners of Appeal,* 18 *N. J. L.* 71, 72 (Sup. Ct. 1840). In short, the power to tax reposes in the State; municipalities have no inherent power to tax and can do so only pursuant to a delegation of the State's power. *Salomon v. Jersey City,* 12 *N. J.* 379, 383–384 (1953).

Hence the fact that the obligation to furnish a service is the State's could not serve as an index to the "fundamental" nature of the right to that service without thereby encompassing a vast range of services now furnished through local government.[6] Nor can it matter that the service

---

[6] The range becomes evident from a body of case law involving the question whether the State may *compel* a municipality to levy a tax. The distinction is drawn between the functions assigned to local government as an agency of the State and those powers given local government for optional use to advance local or "corporate" interests.

is expressly mandated by our State Constitution. For example, our State Constitution vests the judicial power "in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction" and provides that "The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law." *Art.* VI, § 1, ¶ 1. Notwithstanding that the Constitution conspicuously requires the State to provide these indispensable services, it has always been thought to be appropriate to call upon the local government, primarily the counties, to house the courts and to provide personnel necessary for their functioning. Today the bulk of the cost of the judiciary is thus allocated, as are also most of the expenses of criminal prosecutions and of probation services; and since real property ratables are the basic source of local revenues and the amount of judicial activity is not proportional to the amount of ratables (or, for that matter, to population), the burden does not fall equally throughout the State.

It is well settled that the State may compel municipalities to levy a tax with respect to matters committed to them as agencies of the State. 2 *McQuillin, Municipal Corporations* (3d ed. 1966 rev. vol.) § 4.159–4.162, *pp.* 248–253; 16 *McQuillin, Municipal Corporations* (3d ed. 1972 rev. vol.) § 44.33, *pp.* 92–93. Speaking of the power thus to compel municipalities to levy taxes to meet their role as arms of the State government, it is pointed out in 1 *Cooley, Taxation* (Nichols 4th ed. 1924), § 418, *p.* 922:

"\* \* \* Taxes for local police protection and enforcement of the laws, for defense of both the local subdivision and the State, for highways and bridges and canals, for public health, for schools, for charity, are almost universally held not purely local in their character but instead governmental and so public in their nature that the legislature may require municipal or local taxation therefor."

The question sometimes arises under state constitutions which provide broadly that the legislature may not compel municipalities to impose taxes. Such restrictions are usually construed not to apply to "State" services and therefore not to prohibit statutes compelling local taxation as to such matters. Over the years the category of "State" services, within the meaning of such provisions, has expanded. See annotations, 46 *A. L. R.* 609 (1927); 106 *A. L. R.* 906 (1937).

And even if it could be concluded that either a "fundamental right" is involved or that there is a classification on the basis of "wealth," still there would be much obscurity on the remaining issue, whether the classification is justified by a "compelling state interest." Inherent in the concept of local government is the belief that the public interest is furthered when the residents of a locality are given some voice as to the amount of services and expenditures therefor, provided that the cost is borne locally to stimulate citizen concern for performance. Thus it may not be "irrational" to deal with education in those terms. The record before us reveals that only in Hawaii[6a] does State government meet the entire school bill, the State contributions in the other States averaging about 40% of the total cost. Presumably the "compelling state interest" test would demand more than rationality, but we find no decision of the United States Supreme Court holding that the State's interest in the institution of local government would not be "compelling" or defining the limits upon the State's right to use the institution of local government if the State does have a sufficient interest to use that institution.

We repeat that our statutes do not demand unequal expenditures per pupil in the school districts. It is undeniable that local expenditures per pupil do vary, and generally because other essential services must also be met out of the same tax base and the total demands exceed what the local taxpayers are willing or able to endure. But for that same reason similar discrepancies, both as to benefits and burdens, can be found with respect to the other vital services which the State provides through its local subdivisions.[7] The equal

---

[6a]We are informed by *Rodriguez* that Hawaii now permits school districts to raise additional moneys. 93 S. Ct. 1304 n. 102.

[7]That the equal protection contention is not easily limited to the subject of education is made evident by *City of New York v. Richardson, supra,* 473 *F.* 2d 923. It will be recalled that the court rejected a claim that the United States had to assume the entire cost of the

protection proposition potentially implicates the basic tenet of local government that there be local authority with concomitant fiscal responsibility. The case now before us was not tried or argued in terms that local government as a political institution denies equal protection in New Jersey because unequal demands upon unequal tax bases result in statewide inequality as to benefits or as to tax burden. In these circumstances we will not pursue the equal protection issue in the limited context of public education.

Nor do we consider a question the parties have not projected, whether, apart from the equal protection guarantee, there is an implicit premise in the concept of local government that the State may not distribute its fiscal responsibility through that vehicle if substantial inequality will result. It may well be that at one time there was a rough correlation between the needs of an area and the local resources to meet them so that there was no conspicuous unfairness in assigning State obligations to the local units of government. Surely that is not true today in our State. Problems are now mobile. They have settled intensively in

---

welfare programs under the Social Security Act. The plaintiffs also alleged that the implementing State statute denied equal protection. It was alleged that the federal government reimburses New York for 50% of its total welfare costs, and that under the State statute, the City of New York is charged with 25% of the total cost and the State with the balance. The equal protection attack rested upon the allegation that in 1969 only 45% of the State's residents lived in New York City whereas the City was charged with financial responsibility for 74% of the State's welfare recipients, and that 12.52% of New York City's residents received public assistance as against an average of 3.49% for the balance of the State. The question was whether the trial court erred in dismissing the complaint which sought to have a three-man court convened. The Second Circuit concluded that the "compelling interest test" would not apply. Nonetheless it found that under the "rational relationship" standard, the unanswered allegations of the complaint presented a sufficiently substantial constitutional question to warrant convening a three-man court. The merits of course were not reached by the Second Circuit. We cite the Second Circuit case to emphasize that the equal protection issue advanced in the case before us may involve much more than public education.

limited areas. Statewide there is no correlation between the local tax base and the number of pupils to be educated, or the number of the poor to be housed and clothed and fed, or the incidence of crime and juvenile delinquency, or the cost of police or fire protection, or the demands of the judicial process. Problems which are in no sense local in origin have become the special burden of those who cannot find a haven elsewhere.

We need hardly suggest the convulsive implications if home rule is vulnerable upon either of the grounds to which we have referred. Nor need we expound the difficulties of management of judicial solutions if the problem must be met by the courts. We point to the dimensions of the subject to explain why we should not deal with it on the record of this case.

## II

The remaining question is whether certain provisions of our State Constitution, two dealing with public education and a third with the general subject of property taxation, impose the tax burden upon the State's own revenues.

The provisions relating to public education were added to the Constitution of 1844 by amendments adopted in 1875. *Art.* IV, § 7, ¶ 6, was amended by adding this sentence:

"The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this State between the ages of five and eighteen years."

This provision is now *Art.* VIII, § 4, ¶ 1, of the 1947 Constitution. The other amendment in 1875 added *Art.* IV, § 7, ¶ 11, which prohibits "private, local or special laws" in "enumerated cases," among which appears:

"Providing for the management and support of free public schools."

The quoted provision is item (7) in *Art.* IV, § 7, ¶ 9, of the 1947 Constitution, with the word "control" substituted for the word "support."

The tax clause was also added by amendment in 1875 as *Art.* IV, § 7, ¶ 12, and then read:

"Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."

That provision appears in the Constitution of 1947 as *Art.* VIII, § 1, ¶ 1, phrased this way:

"Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, * * * and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district."

### A.

The amendment concerning taxation as added in 1875 was not addressed to the subject of public education. Plaintiffs invoke it this way: They say that since the 1875 amendment concerning public education imposed the school obligation on the State itself, a tax levied to discharge that obligation must be deemed a "State" tax rather than a "local" one and hence, if it is to fall upon property, must fall uniformly upon all taxable property throughout the State.

The short answer is that the tax clause was not intended to say that a State function may not be delegated to local government to be met by local taxation. As we noted in Point I, local government is simply an arm of the State with respect to the many State functions which the State decides shall be performed through local government. The tax clause does not restrict the State with respect to that decision. Rather it means that if the State decides to handle a service at State level and to do so on

the basis of a property tax, it must tax all taxable property in the State rather than only property in a part of the State; and that if the responsibility for the State function is assigned to local government, the local tax must fall uniformly upon all taxable property within the county or the municipality as the case may be.

We should comment upon *Society for Establishing Useful Manufactures v. City of Paterson,* 89 *N. J. L.* 208 (E. & A. 1916). The Society held a charter exemption from taxation of its property. At the time of that litigation, the exemption related to a local property tax but not to a "State" property tax. The case involved a statewide school tax on property, the proceeds of which were distributed to local school districts. The Society contended the tax was a local tax rather than a "State" tax. In holding the tax was a "State" tax, the court said (*pp.* 211–212):

"But it is said that even if the tax be a state, and not a local one, it has not been laid 'for the use of the state,' within the meaning of that phrase as used in the society's charter. That is to say that, although the tax is laid by the state, it is required to be used for local and not for state purposes. As we have already pointed out, the people of this state, by the amendment to the constitution which we have cited, made the maintenance and support of free public schools a matter of state, instead of local, concern. The school tax is laid for the purpose of carrying out this state system of educating our children; it is used for that purpose; and such a use, in our opinion, is as much a state use as the appropriation of moneys to be expended in the support of the state government is an appropriation for a state use; the distribution by the state of the moneys so raised, in such a way as, in the judgment of the Legislature, would best subserve the purpose of the constitutional mandate being a mere matter of administration."

That case does not hold that the State's obligation under the education clause of the Constitution must be furthered only by a statewide tax. It holds only that if the State does choose to impose such a tax, it is a tax for a State use, notwithstanding that the proceeds are appropriated to local school districts for application to that State objective. Nor did that case suggest that a local tax for school purposes

would be a "State" tax rather than a local one. No doubt the City of Paterson also levied a tax for school purposes, but the court did not hold that the tax thus levied locally was beyond the charter exemption with respect to "local" taxes because the tax was levied to fulfill the State's underlying school obligation.

We add that the amendment to the tax clause (*Art.* VIII, § 1, ¶ 1) made in 1947 which speaks of an assessment and tax "by the State for allotment and payment to taxing districts" has no bearing upon the present case. Again we need not burden this opinion with an extended account of the controversy from which that language emerged. It is enough to say that the reference was to a tax levied for local purposes but which was handled administratively at State level to achieve uniformity as to valuation. More precisely, the subject was the taxation of railroad property. Railroad real property (other than the main stem) was subject to taxation for local purposes as was other real property. The assessment machinery, however, was handled by a State assessor on the premise that true value was better ascertained that way. The tax rate of each municpiality was applied to the valuations found in that municipality, to the end that railroad property would bear its pro rata share of the burden of local government. When the Legislature in 1941 provided for a fixed rate of $3.00 on railroad property thus taxed for local use instead of the local (and higher) rate applicable to other real property taxable for local purposes, see *Jersey City v. State Board of Tax Appeals,* 133 *N. J. L.* 202 (Sup. Ct. 1945), modified *sub nom. Jersey City v. Kelly,* 134 *N. J. L.* 239 (E. & A. 1946), a political controversy followed. It led to the addition to the tax clause of the language of which we are now speaking. The intent was that if property is taxed *for local purposes,* then, whether the property is assessed and taxed locally or is assessed and taxed by the State for the benefit of the local taxing districts, the standard of value shall be the same and the rate shall be the general tax rate of the taxing district

applicable to other property within the district. The purpose was to assure that all taxable property within a municipality shall bear the same share of the tax burden of that municipality. The provision thus added to the tax clause in 1947 has nothing to do with the question whether the State may assign a State obligation to local government for discharge by it by use of revenues raised locally.[8] Nor does it mean that a local tax may not be levied to meet an assigned State responsibility.

B

Thus the 1875 tax clause and the 1947 version of it do not limit the legislative discretion with respect to whether to charge local governments with a fiscal obligation in connection with an assignment of the State responsibility for public education. The question, then, is whether that restriction reposes in the public education amendments of 1875 already cited. The Supreme Court of Michigan found that restriction in a provision of the Constitution of that State that "the Legislature shall maintain and support a system of free public elementary and secondary schools as defined by law * * *." *Milliken v. Green*, 389 *Mich.* 1, 203 *N. W.* 2d 457 (Sup. Ct. 1972). The vote was 4 to 3, and we understand a petition for rehearing has been granted. 41 *U. S. L. W.* 2424 (Feb. 13, 1973).

A brief sketch of public education in our State is a necessary backdrop for the issue. Originally education was the province of private schools, including, of course, church-

---

[8] We add that if the Legislature should impose a State property tax and distribute the proceeds to local government to be used for public education, the tax would not fall within the language added to the tax clause in 1947. Such a tax would remain a State tax notwithstanding the provisions appropriating its proceeds. It would not be a tax levied by the State for local purposes in lieu of a tax for local purposes imposed directly through local taxation machinery. Hence the tax rate would be uniform throughout the State without regard to the several local tax rates upon property.

sponsored schools. Those too poor to pay tuition depended upon charity. In 1820 the townships were authorized to raise money by a vote at a town meeting but only for the education of "such poor children as are paupers." In 1828 the townships were authorized to raise moneys by vote at town meetings to build and repair schoolhouses. The State School Fund had been established in 1817 but it was not until 1829 that moneys were appropriated from that fund for the support of such schools. 1 *Myers, The Story of New Jersey* (1945) *pp.* 447–450. The Constitution of 1844 made a commitment by placing that fund, and all additions to it, beyond legislative diversion and mandating that the income "shall be annually appropriated to the support of public schools, for the equal benefit of all the people of the state." *Art.* IV, § 7, ¶ 6. *Everson v. Board of Education of Ewing Township*, 133 *N. J. L.* 350, 352–353 (E. & A. 1945), affirmed 330 *U. S.* 1, 67 S. Ct. 504, 91 *L. Ed.* 711 (1947).

There emerged a program of State appropriation coupled with local taxation. The system worked unevenly, in part because of disparities as to ratables. Then it was the urban areas which had the greater capacity to pay. And public education was not free; it was the custom to charge tuition for public schools. 1 *Myers, The Story of New Jersey* (1945) *pp.* 458–460.

In his 1868 report (*pp.* 22–24), the State Superintendent of Public Instruction advocated free public schools for every district. He pointed out the school law "only gives to the people the privilege of making them [the schools] free, if they desire, by local taxation." The State appropriation was forty cents a child. The township tax, which could not exceed four dollars a child, actually amounted to about three dollars a child. The State Superintendent said the average total of those items, $3.40 per child, "is not sufficient to make the schools free and keep them open a reasonable length of time during the year, hence the people are compelled either to charge tuition fees, or cause a local tax to be assessed." Schools were free in the cities and in about

half the rural districts because city and district taxes were also levied. He concluded that "We need, therefore, a general school fund sufficient to maintain the ordinary grade of schools at times when no extra or unusual expenses are incurred, and a district tax to be assessed in those districts where the people, with more than ordinary enterprise, desire a better grade of schools than can be supported by the general fund, and in all districts where additional funds are needed to erect, furnish, or repair school buildings." The "general fund" to which he referred consisted of the State appropriation and the township school tax. He proposed that the township tax be replaced with an adequate State appriation to cover current operating expenses. His views received strong public support; the Legislature in 1871 almost unanimously passed "an act to make free the public schools of the State." 1 *Myers, op. cit., p.* 472.

The 1871 statute (*c.* 527, *p.* 94) inaugurated a statewide school tax of 2 mills per dollar of assessed value of property, the tax "to be in lieu of all township school taxes * * * but if the moneys received by any township from the tax imposed by this act shall not be sufficient to maintain free schools for at least nine months in each year, then the inhabitants thereof shall raise, by township tax, such additional amount as they may need for that purpose," on pain of losing their share of the State tax. *Sec.* 1, *p.* 94. The State tax was apportioned on the basis of the number of children included in the school census. *Secs.* 4 and 5, *pp.* 95–96. Each city and school district remained empowered to "raise by tax such other sums of money as they may need for school purposes," as authorized by prior law. *Sec.* 7, *p.* 96. It was made unlawful thereafter to charge tuition fees. *Sec.* 9, *p.* 97.

Thus public schools became free. It is notable that the proceeds of the statewide property tax were apportioned on the basis of the number of eligible pupils rather than the value of local ratables or the amounts the State tax yielded in the several districts. A shift to a ratables formula was

made later, after the adoption of the 1875 amendment, for a reason unrelated to the equity of the 1871 basis for apportionment of the tax proceeds. The wealthier counties complained that the rural areas abused the statutory formula by deliberately undervaluing their ratables to avoid a fair share of the burden of the State tax. The charge was credited, and in 1881, to remedy that abuse, the basis for the apportionment of the tax revenues was changed to the tax contributions of the counties (*i. e.*, the assessed value of the ratables) with respect to 90% of the State tax proceeds, the remaining 10% to be distributed equitably by the State Board of Education. *New Jersey School Report for* 1881, *pp.* 29–32. The 10%, which was used to aid the poorer counties, was later whittled down upon the continuing complaint of the more affluent counties. *Bateman Report* (1968) *p.* 16. Thus the State seemingly drifted into a formula of apportionment in which ratables rather than pupils became so prominent, not because ratables were deemed the fair basis for distribution of the tax proceeds, but as an antidote for an abuse with respect to valuation of the tax base. Had there been employed a direct remedy, *i. e.*, statewide equalization of the assessments, thereby to insure an even distribution of the tax burden, it is likely that the per-pupil basis for distribution of the statewide tax proceeds would have retained its inherent equitable appeal.

The 1875 amendment added to *Art.* IV, § 7, ¶ 6, of the Constitution of 1844 the provision that:

> "The legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this state between the ages of five and eighteen years."

There appears to be no helpful history spelling out the intended impact of this amendment.

██ We can be sure the amendment was intended to embody the principle of the 1871 statute that public education for children shall be *free*. It is also plain that the ultimate

responsibility for a thorough and efficient education was imposed upon the State. This has never been doubted.[9] See, for example, the passage we quoted above from *Society for Establishing Useful Manufactures v. City of Paterson, supra,* 89 *N. J. L.* at 211–212.

The obligation being the State's to maintain and support a thorough and efficient system of free public schools, the State must meet that obligation itself or if it chooses to enlist local government it must do so in terms which will fulfill that obligation. But plaintiffs say that although the operation of schools may be delegated, the fiscal responsibility may not. Plaintiffs assert the amendment itself assures equality as among taxpayers. Alternatively they say the amendment assures equality among the pupils of the State and that such equality is not achieved and can-

---

[9]So in construing the statutes relating to the responsibilities of the State Commissioner of Education, we have repeatedly held it to be his affirmative obligation to see to it that the statutory objectives are met, and this on the premise that the Constitution having placed the responsibility on the State, the statutes should be read to mean that the State Commissioner shall see to it that the school districts abide by that mandate in their discharge of the delegated responsibility. Thus we held with respect to a dispute over the amount of a local school budget, that the State Commissioner "is charged with the overriding responsibility of seeing to it that the mandate for a thorough and efficient system of free public schools is being carried out," *Board of Education, E. Brunswick Tp. v. Tp. Council, E. Brunswick,* 48 *N. J.* 94, 106 (1966), and that "it is the duty of the Commissioner to see to it that every district provides a thorough and efficient school system," *Board of Education of the City of Elizabeth v. Elizabeth,* 55 *N. J.* 501, 506 (1970). So too with respect to an issue of racial imbalance, we said that "when the sufficiency of the local choice is brought before him [the State Commissioner] he must affirmatively determine whether the reasonably feasible steps towards desegregation are being taken in proper fulfillment of State policy; if not, he may remand the matter to the local board for further action or may prescribe a plan of his own * * *." *Booker v. Board of Education, Plainfield,* 45 *N. J.* 161, 178 (1965). Upon the same premise, we held that the State Commissioner could, to cope with a problem of racial balance, order a solution which crosses district lines if such a solution is not impractical. *Jenkins v. Township of Morris School District,* 58 *N. J.* 483 (1971).

not be achieved by a system of taxation which depends upon the existing local tax base.

We cannot say the amendment of 1875 was intended to bar the delegation of the taxing responsibility to local government. We know that with respect to the cost of providing the schoolhouse itself, the 1871 statute left the burden with local government and that burden continued there after the 1875 amendment. As the State Superintendent's report for 1881 put it, "The spirit of the school law of New Jersey is that the State shall furnish the means for maintaining the schools while the local authorities shall provide suitable school accommodations" (p. 42). The 1871 statute was concerned with current operating expenses, and as to that subject, the statute was intended to raise by a statewide tax a general fund sufficient to meet the average per-pupil cost of providing the level of instruction then in view, with the city and school district retaining the power to tax to the end that districts "with more than ordinary enterprise," as the 1868 report quoted above expressed it, could provide education above the level the general State fund was intended to provide.

The question whether the tax burden should be borne statewide rather than locally was of course very much in mind at the time of the 1875 amendment. It was discussed in the State Superintendent's reports both before and after the adoption of the amendment.

In his report for 1871 the State Superintendent said "The townships are still authorized to vote school money, and they are even required to do so in case the money derived from the State is not sufficient to maintain free schools nine months, but the amount to be voted will not be, as heretofore, the principal fund upon which the schools are to depend for their support. The principal support will come from the State, and if any sum is needed to be voted by the townships it will be small, and will not meet with that opposition that it has heretofore" (p. 12). He added that "A State school tax is preferable to a local school tax also, be-

cause it is more just, equal, and uniform," pointing out that if the sum of $4.25 needed per child and apportioned under the State school tax were raised by a county tax, county tax rates would vary from 1.4 mills to 4.6 mills (*pp*. 12–13).

The State Superintendent's report for 1878 speaks of the tax system as satisfying "a matter of equity that the expenses incurred in maintaining the schools needed to impart this education, shall be borne by all alike" (*p*. 23). He continued that "New Jersey recognizes the wisdom of this in assessing a uniform rate of tax upon each citizen for the support of her schools, in proportion to the amount of property he possesses, and in apportioning the amount thus raised to the several school districts on the basis of their school census" (*p*. 23). He was speaking in opposition to the view of the wealthier counties that the school burden should be borne by the counties, saying that "What would render this still more unfair is that the poorer the county the heavier would be the rate of taxation to insure equal benefits"; that "It costs about $5 per child to support Public Schools" and "To raise this sum as proposed, the rate of taxation in some of the counties, because of their poverty, would be three times as great as in others, because of their wealth" (*pp*. 23–24).

One gathers that the 1871 formula was thought to operate equitably with respect to the taxpayers as well as the children despite the fact that capital costs remained the local burden and that some but not all of the city and school districts chose to provide for additional current expenditures.[10] But we can find no evidence that the amend-

---

[10]The report of the State Superintendent for 1878 reveals that for the school year ended August 31, 1878, the two-mill State tax appropriated by the State amounted to $1,132,501.38; that there was an additional State appropriation of $100,000; and that the township school tax was but $24,387, while the district and city school tax for teachers' salaries yielded $302,630.59 and district and city school taxes for building and repairing schoolhouses amounted to $379,806.66

ment of 1875 was concerned with taxpayers and was intended to incorporate a principle that the tax burden must be met by a statewide tax.

It seems clear that the 1875 amendment has not been understood to prohibit the State's use of local government with local tax responsibility in the discharge of the constitutional mandate. In *Landis v. Ashworth (School District No. 44), supra,* 57 *N. J. L.* 509, a local tax for school purposes was attacked. One ground was that the school district was not a political division of the State capable of being invested with the power to tax. As we have already mentioned, *Landis* rejected that view, finding the school district was a municipality.

Also relevant are cases which involved the question whether school districts could be classified for legislation under the companion amendment of 1875 prohibiting local or special laws "Providing for the management and support of free public schools." *Art.* IV, § 7, ¶ 11, of the Constitution of 1844 (now *Art.* IV, § 7, ¶ 9(7)). At one point doubt was expressed as to whether school districts could be classified in the face of that prohibition, *Lowthorp v. Trenton,* 62 *N. J. L.* 795 (E. & A. 1898), which issue was resolved in favor of the power to classify in *Riccio v. Hoboken,* 69 *N. J. L.* 649 (E. & A. 1903), but in neither case was it doubted that the State could invest the responsibility, including the taxing power, in local government. Rather the question was whether all such local school governments must be of one structure. The 1875 amendments were assumed to permit the State to delegate "taxing powers to local school districts to raise funds for local school purposes," in *Everson v. Board of Education of Ewing Township, supra,* 133 *N. J. L.* at 353.

---

(*p.* 7). The report discloses that 246 districts raised taxes to pay teachers' salaries, 337 districts raised taxes to build schoolhouses, and 936 districts imposed no tax at all (*p.* 8).

It has been noted that the 1947 Constitutional Convention did not act upon a recommendation of the New Jersey Federation of Labor that education be funded out of State revenues. 5 *Proceedings of the New Jersey Constitutional Convention of 1947,* Appendix, at 893. Such inaction is of doubtful import, but our Constitution was amended in 1958 in terms which did assume that fiscal responsibility was properly reposed in the local school district. *Art.* VIII, § 4, ¶ 2, which preserves the fund for the support of free public schools, was amended by adding:

"The bonds of any school district of this State, issued according to law, shall be proper and secure investments for the said fund and, in addition, said fund, including the income therefrom and any other moneys duly appropriated to the support of free public schools may be used in such manner as the Legislature may provide by law to secure the payment of the principal of or interest on bonds or notes issued for school purposes by counties, municipalities or school districts or for the payment or purchase of any such bonds or notes or any claims for interest thereon."

In the light of the foregoing, it cannot be said the 1875 amendments were intended to insure statewide equality among taxpayers. But we do not doubt that an equal educational opportunity for children was precisely in mind. The mandate that there be maintained and supported "a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years" can have no other import. Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. A system of instruction in any distrct of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation.

We refer again to *Landis v. Ashworth (School District No. 44), supra*, 57 *N. J. L.* 509. There it was contended that the 1875 amendment prohibiting a special or local law with respect to the management and support of free public schools forbade "laws delegating to each school district the power of determining for itself what amount beyond the state appropriation shall be raised by tax therein for the support of public schools in the district, and the power of building schoolhouses and employing teachers, result in affording different degrees of instruction to the children in different districts, while it is the duty of the legislature to see that the same facilities for education are furnished to every child in the state" (*pp.* 511–512). As we have just noted, that contention was based upon the "special or local law" provision of the Constitution. The court replied that a statute conferring the same powers upon the same class of political bodies does not cease to be a general law because the results may not be uniform. But the court did find that the 1875 amendment which imposed the school obligation on the State required equality within the intended range of that amendment, permitting local decisions only above and beyond that mandated education. The court said (*p.* 512):

"Nor can I think that the constitution requires the legislature to provide the same means of instruction for every child in the state. A scheme to accomplish that result would compel either the abandonment of all public schools designed for the higher education of youth or the establishment of such schools in every section of the state within reach of daily attendance by all the children there residing. Neither of these consequences was contemplated by the amendment of 1875. Its purpose was to impose on the legislature a duty of providing for a thorough and efficient system of free schools, capable of affording to every child such instruction as is necessary to fit it for the ordinary duties of citizenship; and such provision our school laws would make, if properly executed, with the view of securing the common rights of all before tendering peculiar advantages to any. But, beyond this constitutional obligation, there still exists the power of the legislature to provide, either directly or indirectly, in its discretion, for the further instruction of youth in such branches of learning as, though not

essential, are yet conducive to the public service. On this power, I think, rest the laws under which special opportunities for education at public expense are enjoyed."

*Landis* could be misread if it is not kept in mind that when *Landis* was decided (1895), secondary schooling as we know it today was not generally available. *Bole and Johnson, The New Jersey High School: A History* (1964) *pp.* 28–36. It was not then an attribute of a thorough and efficient system of public schooling, and for that reason *Landis* found the constitutional requirement was not offended by the fact that "higher education" was not available for all children. But *Landis* held that the education comprehended by the constitutional obligation must be met by "securing the common rights of all." And *Landis* of course did not say the common rights were those of 1875 or 1895. Today, a system of public education which did not offer high school education would hardly be thorough and efficient. The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market.

We are brought then to the question whether the State has fulfilled its obligation to afford all pupils that level of instructional opportunity which is comprehended by a thorough and efficient system of education for students between the ages of 5 and 18. This is the question we flagged in *West Morris Regional Board of Education v. Sills,* 58 *N. J.* 464, 477 n.7 (1971), when we said "We of course do not anticipate the question whether the State statutory scheme may, because of local failures, become unequal to the constitutional promise and command."

The trial court found the constitutional demand had not been met and did so on the basis of discrepancies in dollar input per pupil. We agree. We deal with the problem in those terms because dollar input is plainly relevant and because we have been shown no other viable criterion for

measuring compliance with the constitutional mandate. The constitutional mandate could not be said to be satisfied unless we were to suppose the unlikely proposition that the lowest level of dollar performance happens to coincide with the constitutional mandate and that all efforts beyond the lowest level are attributable to local decisions to do more than the State was obliged to do.

Surely the existing statutory system is not visibly geared to the mandate that there be "a thorough and efficient system of free public schools for the instruction of all the children in this state between the ages of five and eighteen years." Indeed the State has never spelled out the content of the educational opportunity the Constitution requires. Without some such prescription, it is even more difficult to understand how the tax burden can be left to local initiative with any hope that statewide equality of educational opportunity will emerge. The 1871 statute embraced a statewide tax because it was found that local taxation could not be expected to yield equal educational opportunity. Since then the State has returned the tax burden to local school districts to the point where at the time of the trial the State was meeting but 28% of the current operating expenses. There is no more evidence today than there was a hundred years ago that this approach will succeed.

On its face the statutory scheme has no apparent relation to the mandate for equal educational opportunity. The trial court's opinion discusses the existing scheme at length, and we need but summarize it. As the trial court pointed out, we are in a period of transition from one plan to another with respect to the current operating budget. The new plan, contained in the "State School Incentive Equalization Aid Law" (*L.* 1970, *c.* 234), herein the "1970 Act," is but partially funded, and at the moment serves only to accomplish a modification of the plan it would one day supersede.

The plan which the 1970 Act would ultimately replace establishes a foundation program of $400 per pupil, *N. J. S. A.* 18A :58–3 as it existed when the 1970 Act was enacted.

We are told that when that dollar figure was set, it was believed to be the average per pupil cost of providing elementary and secondary education. The figure is now grossly outdated. At any rate, that statute provides for State aid consisting of the difference between $400 per pupil and the sum per pupil raised by a local tax of 10–½ mills per dollar of equalized valuation of taxable property within the school district. There is a minimum guaranty of $75 per pupil, and by other provisions the State adds an additional $25 per pupil throughout the State and $27 per pupil in the major cities.

Under that program the State contributes about 28% of the statewide current operating costs, the balance being raised by local tax except for a small federal contribution. The 1970 Act is expected when fully funded to raise the State's share to 40% which, when that Act was adopted, was said to be the national average of State aid.

The 1970 Act provides for State aid on the basis of "weighted pupils." The weighting is intended to reflect different costs of educating classes of pupils. Thus, to mention some of the categories, a child in kindergarten is weighted at .75, a child in elementary school at 1., and a high school student at 1.3, plus .75 units for each "AFDC" child (a child on welfare). *N. J. S. A.* 18A:58–2. The 1970 Act further provides that the amount of State aid per resident weighted pupil will depend on whether the school district is a "nonoperating district" (does not itself operate schools), a "basic district," a "limited district," an "intermediate district," a "precomprehensive district" or a "comprehensive district." The 1970 Act would assure "minimum support aid" which would depend upon the classification of the districts, the figure ranging from $110 per weighted pupil in a "basic district" to $160 per weighted pupil in a "comprehensive district." *N. J. S. A.* 18A:58–2; 18A:58–5a. We understand the criteria for these districts

have not yet been established or enacted into law, and that all operating districts are for the moment deemed to be "basic districts."

In addition the 1970 Act contemplates "incentive equalization aid." *N. J. S. A.* 18A:58–5b. As we understand the program, it provides for additional State aid with respect to the "net operating budget," which, roughly, is the amount of the current expense budget after deducting certain income including the "minimum support aid" described in the paragraph above. The net operating budget is thus the net sum which would remain to be raised by local taxation, and the "incentive equalization aid" is payable with respect to that net sum. Again the amount of that aid is geared to the standing of each district in the scale mentioned above ranging from a "basic district" to a "comprehensive district." For the purpose of calculating the "incentive equalization aid" a "school district guaranteed valuation" is found for the district by multiplying the number of resident weighted pupils by a valuation per pupil ranging from not less than $30,000 in a "basic district" to not less than $45,000 in a "comprehensive district." *N. J. S. A.* 18A:58–2. If the "school district guaranteed valuation" is less than the equalized valuation of the district, no incentive equalization aid will be paid; and if the guaranteed valuation is more than the equalized valuation, then the "net operating budget" is divided by the "guaranteed valuation," and the resulting rate is applied to so much of the guaranteed valuation as exceeds the equalized valuation, to obtain the amount of the incentive equalization aid. *N. J. S. A.* 18A:58–5b.

As we have said, the 1970 Act is not fully funded. As of the time of trial, the State aid consisted of the aid under the pre-1970 statutes plus 20% of the difference between that sum and the sum which the 1970 Act would yield if fully funded. Again, since the criteria for the classification of operating districts from "basic" to "comprehensive" have not been established, all districts are deemed to be "basic"

for the computation. We note, too, that under the 1970 Act there is a save-harmless provision assuring each district without regard to its wealth that the 1970 Act will not reduce its aid.

We have outlined the formula of the 1970 Act to show that it is not demonstrably designed to guarantee that local effort plus the State aid will yield to all the pupils in the State that level of educational opportunity which the 1875 amendment mandates. We see no basis for a finding that the 1970 Act, even if fully funded, would satisfy the constitutional obligation of the State.

The *Bateman Report* correctly observes that "Basic in any State support plan is the concept that education is a State and not a local responsibility" (*p. 2*). The Report then explains that "This means that the State has a responsibility not only to provide financial assistance to the local district but also to delineate the broad terms of operation of the local district, both financially and educationally" (*pp. 2–3*). The Report acknowledges that one difficulty with the design for local fiscal responsibility is that the tax base to which the school districts are remitted is already overloaded, particularly in the major cities, by the other demands for local service. But as to this factor so critical in any system of local responsibility and incentive-based State aid, the Report recommends further study (*pp. 42–43*).

We repeat that if the State chooses to assign its obligation under the 1875 amendment to local government, the State must do so by a plan which will fulfill the State's continuing obligation. To that end the State must define in some discernible way the educational obligation and must *compel* the local school districts to raise the money necessary to provide that opportunity. The State has never spelled out the content of the constitutionally mandated educational opportunity. Nor has the State *required* the school districts to raise moneys needed to achieve that unstated standard. Nor is the State aid program designed to compensate for local failures to reach that level. It must be evident that

our present scheme is a patchy product reflecting provincial contests rather than a plan sensitive only to the constitutional mandate.

 We have discussed the existing scene in terms of the current operating expenses. The State's obligation includes as well the capital expenditures without which the required educational opportunity could not be provided.

Upon the record before us, it may be doubted that the thorough and efficient system of schools required by the 1875 amendment can realistically be met by reliance upon local taxation. The discordant correlations between the educational needs of the school districts and their respective tax bases suggest any such effort would likely fail, and this wholly apart from the issues we left unresolved in Point I.

Although we have dealt with the constitutional problem in terms of dollar input per pupil, we should not be understood to mean that the State may not recognize differences in area costs, or a need for additional dollar input to equip classes of disadvantaged children for the educational opportunity.[11] Nor do we say that if the State assumes the cost of providing the constitutionally mandated education, it may not authorize local government to go further and to tax to that further end, provided that such authorization does not become a device for diluting the State's mandated responsibility.

The present system being unconstitutional, we come to the subject of remedies. We agree with the trial court that relief must be prospective. The judiciary cannot unravel the fiscal skein. Obligations incurred must not be impaired. And since government must go on, and some period of time will be needed to establish another statutory system, obligations hereafter incurred pursuant to existing statutes will

---

[11]See *Lau v. Nichols*, 472 *F.* 2d 909 (9 Cir. 1973), where the court divided upon whether equal protection required that non-English speaking Chinese students be provided with bilingual compensatory education in the English language.

be valid in accordance with the terms of the statutes. In other respects we desire the further views of the parties as to the content of the judgment, including argument as to whether the judiciary may, as the trial court did with respect to the "minimum support aid" and the save-harmless provision of the 1970 Act, 118 *N. J. Super.* at 280–281, order that moneys appropriated by the Legislature to implement the 1970 Act shall be distributed upon terms other than the legislated ones. A short date for argument will be fixed.

Subject to the modifications expressed in this opinion and the matters reserved in the preceding paragraph, the judgment of the trial court is affirmed.

*For affirmance and modification*—Chief Justice WEIN-TRAUB, Justices JACOBS, HALL, MOUNTAIN and SULLIVAN, and Judges CONFORD and LEWIS—7.

*For reversal*—None.