643 A.2d 575

RAYMOND ARTHUR ABBOTT, A MINOR, BY HIS GUARDIAN AD LITEM, FRANCES ABBOTT; ARLENE FIGUEROA, FRANCES FIGUEROA, HECTOR FIGUEROA, ORLANDO FIGUEROA, AND VIVIAN FIGUEROA, MINORS, BY THEIR GUARDIAN AD LITEM, BLANCA FIGUEROA; MICHAEL HADLEY, A MINOR, BY HIS GUARDIAN AD LITEM, LOLA MOORE; HENRY STEVENS, JR., A MINOR, BY HIS GUARDIAN AD LITEM, HENRY STEVENS, SR.; CAROLINE JAMES AND JERMAINE JAMES, MINORS, BY THEIR GUARDIAN AD LITEM, MATTIE JAMES; DORIAN WAITERS, AND KHUDAYJA WAITERS, MINORS BY THEIR GUARDIAN AD LITEM, LYNN WAITERS; CHRISTINA KNOWLES, DANIEL KNOWLES AND GUY KNOWLES, JR.,

MINORS BY THEIR GUARDIAN AD LITEM, GUY KNOWLES, SR.; LIANA DIAZ, A MINOR, BY HER GUARDIAN AD LITEM, LUCILA DIAZ; AISHA HARGROVE AND ZAKIA HARGROVE, MINORS, BY THEIR GUARDIAN AD LITEM, PATRICIA WATSON; AND LAMAR STEPHENS AND LESLIE STEPHENS, MINORS, BY THEIR GUARDIAN AD LITEM, EDDIE STEPHENS, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. FRED G. BURKE, COMMISSIONER OF EDUCATION; EDWARD G. HOFGESANG, NEW JERSEY DIRECTOR OF BUDGET AND ACCOUNTING; CLIFFORD A. GOLDMAN, NEW JERSEY STATE TREASURER; AND NEW JERSEY STATE BOARD OF EDUCATION, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

Argued May 24, 1994—Decided July 12, 1994.

*Benjamin Clarke,* Assistant Attorney General, argued the cause for respondents and cross-appellants (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Mr. Clarke* and *William C. Brown,* Deputy Attorney General, on the briefs).

*Paul L. Tractenberg* and *Marilyn J. Morheuser* argued the cause for appellants and cross-respondents (*Ms. Morheuser,* attorney; *Jonathan Feldman,* of counsel; *Ms. Morheuser, Mr. Feldman* and *Valerie M. Van Baaren,* on the briefs).

*Lawrence S. Lustberg* argued the cause for *amicus curiae* The League of Women Voters of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg* and *Jonathan Romberg,* on the brief).

*Stephen B. Wiley* argued the cause for *amicus curiae* Foundation Aid Districts Association (*Wiley, Malehorn & Sirota,* attorneys; *Mr. Wiley* and *James M. McCreedy,* on the brief).

*Richard A. Friedman* submitted a brief on behalf of *amicus curiae* New Jersey Education Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

PER CURIAM.

We affirm the judgment of the Chancery Division declaring unconstitutional the Quality Education Act (the Act or QEA),

*N.J.S.A.* 18A:7D-1 to -37. Our decision is based on the Act's failure to assure parity of regular education expenditures between the special needs districts and the more affluent districts. The State informs us that it does not anticipate that the Act in its present form will continue to control financing of public education.

We retain jurisdiction. We decline to enter any orders now. The substantial increase in State aid to the thirty special needs districts (approximately $700 million) since our opinion, *Abbott v. Burke*, 119 *N.J.* 287, 575 *A.*2d 359 (1990), compared to the wealthier districts (no increase), and the consequent change in the relative disparity of expenditures for regular education between the two (average per-pupil expenditures in the special needs districts before QEA were either approximately 70% or 75% of that in the richer districts, and are now approximately 84%) constitute, within a framework of commitment to parity, a constitutionally legitimate response of the other branches of government to our ruling in that case, given all the circumstances.

We will not intervene, except as noted below, if substantial equivalence of the special needs districts and the wealthier districts in expenditures per pupil for regular education is achieved for school year 1997-1998 along with provision for the special educational needs of students in those special needs districts. That school year is selected in view of the current statute requiring compliance by an even earlier school year, 1995-1996, and in conformance with plaintiffs' suggested timetable calling for compliance by 1997-1998.

If movement towards that end at any time suggests less than a reasonable likelihood of achieving compliance by 1997-1998, we will entertain applications for relief from any party to this action. More specifically, if the relative disparity, now at 16%, is not further addressed in both school years 1995-1996 and 1996-1997, we will hear such applications. Furthermore, if a law assuring such substantial equivalence, approximating 100%, for school year 1997-1998 and providing as well for special educational needs is

not adopted by September 1996, we will consider applications for relief.

By "regular education" we mean what was known as the Net Current Expense Budget, now called under QEA the Local Levy Budget. By "provision for special educational needs" we mean sums in addition to those for regular education. By a "law assuring substantial equivalence," we mean a law that will by its own terms automatically achieve substantial equivalence in per pupil regular education expenditures without depending on the discretionary actions of officials and, to the extent local fair shares or their equivalent are required, will automatically, and without procedural delay, result in the raising of funds for such shares.

## I

We explain briefly why the QEA fails to assure substantial equivalence between the special needs districts and the richer districts in expenditures per pupil for regular education. Although the specific mathematical formulas involved in calculating the spending and funding provisions of the QEA are extraordinarily complex, the basic legislative design is simple and straightforward, as are the reasons why QEA failed to assure and achieve parity. The Legislature declared as its objective that the QEA formula would "provide that by the 1995–1996 school year, the per pupil expenditures in the poorer urban districts will be substantially equal to those in the wealthy suburban districts." *N.J.S.A.* 18A:7D–2b(5). To achieve that goal, the Legislature addressed both spending and funding for special needs districts. Although the QEA authorized, but did not compel, the special needs districts to *spend* enough each year to achieve parity by the 1995–1996 school year, the Act did not guarantee funding sufficient to *pay* for the authorized level of spending.

The QEA directs the Commissioner of Education (Commissioner) to calculate annually an equity spending cap permitting an increase in the budgets of each special needs district that, if sustained through the 1995–1996 school year, would result in the

per pupil special needs districts' budgets equalling the average per pupil budgets of the so-called I and J districts, the richer districts. *N.J.S.A.* 18A:7D–28c. Because the equity spending cap is permissive, not mandatory, *N.J.S.A.* 8A:7D–28d, the funding provisions of the QEA dictate whether the special needs districts can afford the spending levels permitted by the equity spending cap.

The QEA's funding provisions contemplate the payment of foundation aid for current expense and capital outlay to special needs districts in an amount essentially equal to the difference between each district's "maximum foundation budget" and its "local fair share," *N.J.S.A.* 18A:7D–4. The QEA calculates local fair share in a manner designed to reflect a school district's fiscal capacity, determined by a formula based primarily on the district's equalized property value and the aggregate income of the district's residents. *N.J.S.A.* 18A:7D–7. That calculation of local fair share was intended to address our holding in *Abbott* authorizing the Legislature to determine the division between state aid and local funding "consistent with the constitutional obligation," provided that funding in special needs districts cannot "depend on the budgeting and taxing decisions of local school boards." 119 *N.J.* at 388, 575 *A.2d* 359. Because local fair share is determined by a fixed mathematical formula, the critical variable in determining foundation aid under the QEA is the maximum foundation budget, which effectively controls the amount of foundation aid districts will receive from the State.

The complex calculation of a school district's maximum foundation budget, *N.J.S.A.* 18A:7D–6, begins with a legislatively predetermined foundation amount per pupil of $6,640 for the 1991–92 school year, which is increased each year by the average annual percentage increase in State per capita income over the four prior fiscal years. *Ibid.* The per-pupil foundation amount is multiplied by foundation aid units, calculated in turn on the basis of statutory foundation weights applied to the number of pupils in various statutory grade categories, to reflect the increase in cost of educating pupils as they advance to higher grades. *Ibid.* In

·special needs districts, the foundation weight for each grade category is to be multiplied by the *special needs weight,* legislatively set at 1.05, *ibid.,* but subject to increase in April of 1992 and 1994 by the Governor, unless disapproved by the Legislature. *N.J.S.A.* 18A:7D–13. The legislative authorization to increase the *special needs weight,* which has never been exercised, is the mechanism by which the QEA theoretically could have enabled the special needs districts to increase their maximum foundation budgets and their foundation aid, in order to achieve parity with the richer districts.

The remaining element of a district's maximum foundation budget is the facilities component, calculated by multiplying the facilities aid amount, statutorily set at $107 for the 1991–1992 school year and subject to annual increases, by the district's student enrollment for the prior year. The sum of the facilities component, and the product of the foundation amount and the district's foundation aid units, equals the district's maximum foundation budget. *N.J.S.A.* 18A:7D–6.

Stated as simply as these complex formulas permit, the QEA relies on a spending calculation—the equity spending cap—and a funding calculation—the maximum foundation budget which determines foundation aid—to assist the special needs districts in attaining parity. Theoretically, the equity spending cap, although not mandatory, would have allowed the special needs districts to have spent enough per pupil to achieve parity with the richer districts in 1995–96. (In fact, the Department of Education (Department) did not calculate the equity spending cap for the 1993–1994 school year.) A basic flaw in the QEA's design, however, is the absence of any link between the equity spending cap, which determines allowable spending, and the maximum foundation budget, which determines the amount of foundation aid funding available for the special needs districts.

Although the State's expert witness acknowledged at trial that parity between the special needs districts and the richer districts was "mathematically" possible under the QEA, he conceded that

"without the assurance of the Governor recommending an [increase in] the special needs weight ... there is no specific assurance that parity would be achieved...." As noted, the special needs weight—which was the statutory mechanism designed to increase foundation aid for the special needs districts—has never been increased. Because the QEA's design for achieving parity depends fundamentally on the *discretionary* action of the executive and legislative branches to increase the special needs weight, which in turn would increase the maximum foundation budget and the amount of foundation aid in the special needs districts to the levels required for parity, the statute fails to *guarantee* adequate funding for those districts. Accordingly, the conclusion is unavoidable that the QEA does not comply with *Abbott*'s mandate that the required level of funding for the special needs districts "cannot be allowed to depend on the ability of local school districts to tax ... [and] must be guaranteed and mandated by the State...." 119 *N.J.* at 295, 575 *A.*2d 359. We so hold.

## II

In respect of the action to be taken by the State, we note our specific concerns about the need for supervision of the use of additional funding for the special needs districts, and the need for the State to identify and implement supplemental programs and services targeted to the needs of school children in the special needs districts.

Based on the trial record, the inference is compelling that no mechanism presently is in place to control, regulate or monitor the uses of the additional funding made available to the special needs districts pursuant to *Abbott*. Although the QEA required each special needs district to establish an educational improvement plan, to be approved by the Commissioner, and directed the Commissioner to verify that each district's budget had adequate resources to implement the plan, *N.J.S.A.* 18A:7D–32, no evidence in the record suggests any correlation between the additional funding received by the special needs districts and the implemen-

tation of their respective educational improvement plans. We discern no legislative mandate to the Department to exercise control or supervision over the additional funding for special needs districts. We are uninformed by the record of the existence of any regulation or procedure instituted by the Department or by the Commissioner to direct, regulate or otherwise monitor the use of these additional funds.

We would not presume to order that any such regulation or supervision be undertaken: that determination should be made by the other branches of government. But recognizing the legitimate public concerns that the added funding directly benefit the children in the special needs districts, and the State's argument that funding should not be increased at a rate faster than the districts can constructively absorb and allocate, we find inescapable the conclusion that the Legislature or the Department should ensure that the uses of the additional funding available to the special needs districts are supervised and regulated. Such supervision could include the authority to withhold disbursement of funds (but not their appropriation) until the Department is satisfied that the additional funds will be spent constructively to meet the most pressing educational needs of the district's school children. We anticipate that the legislative and administrative response to this decision will address fully the State's obligation to verify that the additional funding for the special needs districts mandated by *Abbott* significantly enhances the likelihood that the school children in those districts attain the constitutionally-prescribed quality of education to which they are entitled. We do not intend or suggest that the State create a new level of bureaucracy that might hinder or delay the achievement of parity or stifle legitimate community participation in educational improvement.

■ We have similar concerns about the State's failure to date adequately to address the "special educational needs" of poorer urban districts for which *Abbott* required funding in addition to that necessary to achieve parity with the richer districts. 119 *N.J.* at 295, 575 *A.2d* 359. Although the QEA includes a formula for

calculating aid for programs for at-risk-pupils, the parties stipulated that in setting the QEA's statutory weights that determined the amount of at-risk-aid, the Legislature made no study of the added costs associated with providing services for at-risk students. Moreover, although legislation was enacted specifically to require the Commissioner, in accordance with our holding in *Abbott*, to undertake a study of the programs and services to be implemented for disadvantaged students, including their costs, for use in preparation of the Department's budget request for the 1993 fiscal year, *L.* 1991, *c.* 259, § 2, that study apparently has not been completed.

The testimony of both plaintiff's and the State's expert witnesses confirm the dire need for specific programs and funding addressed to the educational needs of these disadvantaged students. The Director of the Department's Division of Urban Education identified specific supplemental programs as beneficial or essential for special need district students including pre-school programs, all-day kindergarten, health services, comprehensive guidance and counseling, smaller class sizes for early grades, summer school and outreach for dropouts. Plaintiff's expert concurred, identifying additional programs she deemed essential for disadvantaged students but unnecessary in wealthier suburban districts, and offering cost estimates for those programs based on her specific experience in the Jersey City school district. We imply no view that all or any such supplemental programs are essential for students in special needs districts, noting only that those programs were endorsed by expert witnesses for both sides. We leave that question to those responsible for assuring that the special needs of these districts are met: the Department and the Legislature.

The parties' agreement on the question of special educational needs, consistent with the Court's holding in *Abbott* and reiterated here, confirms that students in the special needs districts have distinct and specific requirements for supplemental educational and educationally-related programs and services that are unique

to those students, not required in wealthier districts, and that represent an educational cost not included within the amounts expended for regular education.

The primary concern, the goal, of the Department, the Legislature and indeed the public, is the actual achievement of educational success in the special needs districts. The record before us makes it clear that that success cannot be expected to be realized unless the Department and the Commissioner identify and implement the special supplemental programs and services that the children in these districts require. Without them, they will not have a fair chance to achieve that success. The money mandated by *Abbott* cannot bridge the gap without significant intervention in the form of special programs and services targeted to the needs of these disadvantaged students.

### III

We reaffirm our holding in *Abbott, supra.* For these special needs districts, a thorough and efficient education—one that will enable their students to function effectively in the same society with their richer peers both as citizens and as competitors in the labor market—is an education that is the substantial equivalent of that afforded in the richer districts. Those students in the special needs districts, given their educational disadvantages and the circumstances of their environment, will not be able to function effectively as citizens in that society, will not be able to fairly compete as workers. They are entitled at least to the chance of doing so, and without an equal educational opportunity, they will not have that chance. Their situation in society is one of extreme disadvantage; the State must not compound it by providing an inferior education. It is the State and only the State that is responsible for this educational disparity, and only the State can correct it. Through its laws, a system of education exists that is not thorough and efficient for these students in the special needs districts. The State must remedy that failing.

As we noted in *Abbott,* equality of money does not assure equality of education. Nor does the grant of additional funds assure that they will be well spent. The responsibility for substantive education is squarely and completely committed to the State; delegation of any part of the educational function to school districts does not dilute that State responsibility at all. This Court will not, and should not, assume any part of that responsibility. While our power is not limited to a money remedy, *Abbott, supra,* 119 *N.J.* at 388, 575 *A.*2d 359, given the State's record, and its strong commitment to public education, it would be an abuse of judicial power for this Court to assume the role assigned by law to the Commissioner and Department. More than that, it would be extremely unwise: we are simply not equipped for such a role, nor capable of it. We will do only that which we are capable of doing, we will assure the opportunity for this substantially equivalent education by ordering substantially equivalent funding: it is up to the State to assure that the money is spent well and not wasted.

Our view of the matter is not new. "Obviously, equality of dollar input will not assure equality in educational results ... [b]ut it is nonetheless clear that there is a significant connection between the sums expended and the quality of the educational opportunity." *Robinson v. Cahill,* 62 *N.J.* 473, 481, 303 *A.*2d 273 (1973). And, in a later *Robinson* case, *Robinson v. Cahill,* 69 *N.J.* 449, 455, 355 *A.*2d 129 (1976), we observed that "money is only one of a number of elements" involved in education. We noted later in *Abbott* that that observation, "simplistic perhaps, ... still represents most of what one can profitably glean from this controversy [about the relationship between money and the quality of education] for the purposes of this litigation." *Abbott, supra,* 119 *N.J.* at 377, 575 *A.*2d 359.

In *Abbott,* in general response to the variety of claims, however stated, that money was not the answer, we said:

We realize our remedy here may fail to achieve the constitutional object, that no amount of money may be able to erase the impact of the socioeconomic factors that define and cause these pupils' disadvantages. We realize that perhaps nothing short of substantial social and economic change affecting housing, employment,

child care, taxation, welfare will make the difference for these students; and that this kind of change is far beyond the power or responsibility of school districts. We have concluded, however, that even if not a cure, money will help, and that these students are constitutionally entitled to that help.

[*Id.* at 374–75, 575 *A.*2d 359.]

In answer to the claim that even with additional funding, the special needs districts still would not satisfy the thorough and efficient test, we noted they were "entitled to pass or fail with at least the same amount of money as their competitors"; to the claim that even with more money "these students simply cannot make it," we said they should be given a chance, that they should not be given less because more will not help, and that if it is true that their needs cannot be fully met, that doesn't mean that their needs should not be met at all. We noted that "like other states, we undoubtedly have some 'uneducable' students, but in New Jersey there is no such thing as an uneducable district, not under our Constitution." And we underlined the clear and absolute responsibility of the State for both the problem and its solution, noting that all of the money that supports education—all of it public money whether the taxes are local or State—is authorized and controlled in terms of its source, amount, distribution, and use by the State, and that all of the students are citizens of the State, no less citizens in the special needs districts than in the richer districts, all entitled to be treated equally, to begin at the same starting line. *Id.* at 375, 575 *A.*2d 359.

We assume no reminder is needed of the plight of these students, whose education and lives are at stake. We repeat the reminder, however, that also at stake is the future of the State and the rest of its citizens:

While the constitutional measure of the educational deficiency is its impact on the lives of these students, we are also aware of its potential impact on the entire state and its economy—not only on its social and cultural fabric, but on its material well-being, on its jobs, industry, and business. Economists and business leaders say that our state's economic well-being is dependent on more skilled workers, technically proficient workers, literate and well-educated citizens. And they point to the urban poor as an integral part of our future economic strength. In short, they urge the state to go about the business of substantially improving the

education of the very subjects of this litigation, the students in poorer urban districts. So it is not just that their future depends on the State, the state's future depends on them. That part of the constitutional standard requiring an education that will enable the urban poor to compete in the marketplace, to take their fair share of leadership and professional positions, assumes a new significance.

[*Id.* at 392, 575 *A.*2d 359.]

In addition to the impact of the constitutional failure on our economy, we noted the unmistakable further impact of the fact that soon one-third of our citizens will be Black or Hispanic, many of them undereducated, isolated in a separate culture, affected by despair, sometimes bitterness and hostility, constituting a large part of society that is disintegrating, which disintegration will inevitably affect the rest of society. *Id.* at 392–93, 575 *A.*2d 359. We noted that "[e]veryone's future is at stake, and not just the poor's. Certainly the urban poor need more than education, but it is hard to believe that their isolation and society's division can be reversed without it." *Id.* at 393, 575 *A.*2d 359.

Our ultimate constitutional focus, however, must remain on the students:

This record proves what all suspect: that if the children of poorer districts went to school today in richer ones, educationally they would be a lot better off. Everything in this record confirms what we know: they need that advantage much more than the other children. And what everyone knows is that—as children—the only reason they do not get that advantage is that they were born in a poor district. For while we have underlined the impact of the constitutional deficiency on our state, its impact on these children is far more important. They face, through no fault of their own, a life of poverty and isolation that most of us cannot begin to understand or appreciate.

[*Id.* at 394, 575 *A.*2d 359.]

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN.