942 A.2d 827

ROSALIE BACON, INDIVIDUALLY AND ON BEHALF OF G.P., Z.P., J.B., J.B., M.B., D.B., AND Z.H.; JOSEPH BARUFFI, INDIVIDU-ALLY AND ON BEHALF OF J.B.; ELIZABETH CULLEN, INDI-VIDUALLY AND ON BEHALF OF T.C.; EDIE RILEY, INDI-VIDUALLY AND ON BEHALF OF S.R.; ARNETTA RIDGEWAY AND CHRISTOPHER GLASS, INDIVIDUALLY AND ON BE-HALF OF J.G., F.G., AND D.G.; COMMERCIAL, HAMMONTON, LITTLE EGG HARBOR, MAURICE RIVER, OCEAN, QUINTON, SALEM CITY, UPPER DEERFIELD, AND WALLINGTON SCHOOL DISTRICTS, PETITIONERS, AND BUENA REGION-AL, CLAYTON, EGG HARBOR CITY, FAIRFIELD, LAKE-HURST, LAKEWOOD, LAWRENCE, AND WOODBINE SCHOOL DISTRICTS, PETITIONERS–APPELLANTS, v. NEW JERSEY STATE DEPARTMENT OF EDUCATION, RESPONDENT–RE-SPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 3, 2007—Decided March 14, 2008.

Before Judges PARRILLO, GRAVES and ALVAREZ.

*Kathy Balin* argued the cause for appellants (*Jacob & Chiarello, L.L.C.*, attorneys; *Frederick A. Jacob*, on the briefs).

*Michael C. Walters,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Mr. Walters,* on the brief).

*Elizabeth Athos* argued the cause for amicus curiae Education Law Center (*Education Law Center and Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Lawrence S. Lustberg* and *Ms. Athos,* on the brief).

The opinion of the court was delivered by

PARRILLO, J.A.D.

Eight rural and poor school districts appeal from a final decision of the New Jersey State Board of Education (Board) which found their circumstances mirrored those of numerous poor, urban school districts presently receiving remedial relief in accordance with a series of Supreme Court decisions, commonly known as the *Abbott* decisions, yet failed to require that same remedial relief for appellants. Instead, the Board instituted a process to systematically remedy the deficiencies it found existed in the implementation of the current school funding statute, the Comprehensive Educational Improvement and Financing Act of 1996, *N.J.S.A.* 18A:7F–1 to –42 (CEIFA). On appeal, appellants claim that CEIFA is unconstitutional as applied to them, and that they are entitled to immediate, remedial relief.

(I)

Some background is in order. Our constitution requires that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." *N.J. Const.* art. VIII, § 4, ¶ 1. New Jersey's system of financing public education was first challenged in 1970 in a lawsuit initiated on behalf of children residing in property-poor urban school districts. *See Robinson v. Cahill,* 118 *N.J.Super.* 223, 287 *A.2d* 187 (Law Div.1972), *aff'd in part, modi-*

*fied in part*, 62 *N.J.* 473, 303 *A.2d* 273, *cert. denied*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973). Since then, there have been a series of Supreme Court decisions identifying those school districts meeting the dual criteria of educational failure over (1) an extended period of time and (2) poverty, *Abbott v. Burke*, 119 *N.J.* 287, 385–86, 575 *A.2d* 359 (1990) (*Abbott II* ); *Abbott v. Burke*, 149 *N.J.* 145, 155 n. 3, 693 *A.2d* 417 (1997) (*Abbott IV* ); *Abbott v. Burke*, 153 *N.J.* 480, 710 *A.2d* 450 (1998) (*Abbott V* ), and four major legislative efforts to establish a funding system that fulfills the constitutional mandate of a "thorough and efficient" education for these districts.

To this end, in 1974, the New Jersey Department of Education (Department) classified the State's school districts by socio-economic status. *Abbott IV, supra*, 149 *N.J.* at 155 n. 3, 693 *A.2d* 417 (citing *Abbott II, supra*, 119 *N.J.* at 384–85, 575 *A.2d* 359). Ten groups, known as District Factor Groups (DFGs), were established, designated as DFG A through J. *Ibid.* (citing *Abbott II, supra*, 119 *N.J.* at 385, 575 *A.2d* 359). "A" districts had the lowest socio-economic status, while "J" districts had the highest. *Ibid.* The Department also identified "urban districts;" in 1990, there were fifty-six such districts. *Ibid.* (citing *Abbott II, supra*, 119 *N.J.* at 386, 575 *A.2d* 359). Following the Supreme Court's decision in *Abbott II*, thirty urban districts with the strongest characteristics of poverty and need, and located in DFGs A and B, were denominated as "special needs districts" (SNDs) in the Quality Education Act of 1990, *N.J.S.A.* 18A:7D–1 to –37 (repealed 1996) (QEA), *Abbott IV, supra*, 149 *N.J.* at 155 n. 3, 157, 693 *A.2d* 417, and later categorized as "Abbott districts" under CEIFA, *N.J.S.A.* 18A:7F–3, which replaced the QEA.[1]

---

[1] While the districts that had been classified as "special needs districts" under the QEA had been specified by the Legislature, the classification was criteria-based and initially included thirty districts rather than the twenty-eight listed in the appendix to *Abbott II*. There are currently thirty-one Abbott districts, including Salem City, which was added to the list, *N.J.S.A.* 18A:7F–3, following issuance of the Commissioner's decision in this case. *L.* 2004, *c.* 61, § 1.

The QEA had itself replaced the guaranteed tax base approach of the Public School Education Act of 1975, *N.J.S.A.* 18A:7A–1 to –60 (partially repealed 1990), held unconstitutional in *Abbott II* as applied to the poorer, urban districts, with a foundation plan intended to reduce disparities in per pupil spending between poor and wealthy districts by generating state aid based on both the property wealth of a district and the personal income of its residents. *Abbott II, supra,* 119 *N.J.* at 385–89, 575 *A.2d* 359. Under the QEA, as noted, thirty urban school districts were identified as having "special needs" and were afforded a higher foundation amount by virtue of that status. *Abbott IV, supra,* 149 *N.J.* at 157, 693 *A.2d* 417. The ability of the district to support its "foundation budget" from local property taxes was based on its property wealth and the income of its residents, and the State paid foundation "aid" based on the difference. *Id.* at 164, 693 *A.2d* 417. Equalization in per pupil expenditures would be achieved under this system by increasing state aid to the "special needs districts" while restricting aid to the wealthiest DFGs I and J. *Ibid.*

Finding there was no guarantee this would occur, the Court held that the QEA was unconstitutional as applied to the "special needs districts" because it failed to ensure parity in regular education expenditures between the thirty "special needs districts" and the wealthiest districts and because it failed to adequately address the unique needs of students in the "special needs districts." *Abbott v. Burke,* 136 *N.J.* 444, 446–51, 453–54, 643 *A.2d* 575 (1994) (*Abbott III* ). The Court, however, withheld direct affirmative remedial relief on the condition that appropriate legislation be enacted for school year 1997–98. *Id.* at 447, 643 A.2d 575.

The Legislature's response was CEIFA. This latest effort to meet the Court's requirements in *Abbott II* created substantive educational standards by which to measure a "thorough and efficient ... education," *N.J.S.A.* 18A:7F–2(b)(1),(2); established a fixed "cost per elementary pupil" of providing the educational opportunity necessary for students to achieve those standards,

*N.J.S.A.* 18A:7F–3; and set forth a funding mechanism both to provide a sufficient level of financial support to meet these goals and to ensure that the State's poorest school districts receive aid in parity with the spending of the richest districts. *N.J.S.A.* 18A:7F–2(b)(3), (4). Under CEIFA, Abbott districts receive a combination of state aid pursuant to statutory provisions designed to address the educational needs resulting from poverty of students in *all* school districts with concentrations of such students, and additional aid, known as "parity aid" or "equal opportunity aid," appropriated annually by the Legislature, intended to support the per pupil expenditure level of the Abbott Districts at the level of the districts in DFG I and J, the highest DFG. *Abbott V, supra,* 153 *N.J.* at 567, 710 *A.2d* 450. These districts also received additional aid to support both specific programs and preschool programs. *Id.* at 504–05, 710 *A.2d* 450. According to the Board,

[b]y virtue of the aid that has been afforded them since CEIFA's enactment, Abbott Districts have been able to maintain their per pupil expenditures at the level of New Jersey's wealthiest school districts and also to provide programs designed to redress the educational disadvantages resulting from the socioeconomic conditions shown by the litigation in *Abbott II*. At the same time, under CEIFA, the state's wealthiest districts have continued to meet their educational needs largely by reliance on the financial resources generated by their property values.

In *Abbott IV*, the Court declared CEIFA unconstitutional as applied to the Abbott "special needs districts," 149 *N.J.* at 153, 168–77, 693 *A.2d* 417, in part because its supplementary programs were not based on actual student need, and because it did not address the facilities issues confronting the Abbott districts. *Id.* at 181–88, 693 *A.2d* 417. In addition to ordering parity funding as an interim remedy, the Court remanded the matter to the Commissioner to determine the judicial and legislative relief required to address the need for supplemental programs and facilities improvement. *Id.* at 198–202, 693 *A.2d* 417. A Special Master conducted the remand proceedings and pursuant to his recommendation, the Court in *Abbott V* ordered remedial relief in three areas in addition to parity funding: whole school reforms, supplemental programs like kindergarten and pre-school, and facilities improvements. 153 *N.J.* at 527, 710 *A.2d* 450.

(II)

All this is by way of background. In December 1997, twenty rural and property-poor school districts (the Bacon Districts)—as distinguished from the poor urban Abbott school districts—filed a complaint [2] in the Chancery Division against the Department, the Commissioner of the Department (Commissioner), and several state officials, seeking both a declaratory judgment that CEIFA was unconstitutional because it resulted in inadequate funding for their needs and therefore failed to meet the State's obligation to provide a thorough and efficient education for their students, and an order directing funding equivalent to that provided to the State's richest school districts.

The Bacon districts are located in six counties throughout the State and have been classified by the Department as being in the poorest category of school districts in the State, DFG A and B. In their complaint, the Bacon districts alleged, based on statistical data, that their educational conditions were similar to those identified in the Abbott Districts, even though they were using their fiscal resources as efficiently as possible. Because they lacked the property wealth of New Jersey's wealthier districts and therefore could not rely on property taxes to generate adequate per pupil expenditures, they claimed they needed even more financial resources than the wealthier districts to provide educational services and programs required to address the special educational needs of their students arising from socioeconomic conditions present in their districts. In other words, they argued that although CEIFA does provide aid based on concentrations of poverty, the conditions

---

[2] The caption to the complaint listed only seventeen school districts, specifically, the Buena Regional, Commercial Township, Egg Harbor City, Fairfield Township, Lakehurst, Lakewood, Lawrence Township, Little Egg Harbor, Lower Township, Lower Cape May Regional, Maurice River Township, Ocean Township, Quinton, Salem City, South River, Upper Deerfield, and Woodbine school districts. However, in the body of the complaint, three additional school districts were included as plaintiffs, specifically, the Clayton, Hammonton and Wallington school districts. On March 2, 1998, an amended complaint was filed that joined these three other school districts.

in their districts are such that they need the same resources, beyond those afforded pursuant to CEIFA's statutory provisions, that have been provided to the Abbott districts through additional legislative appropriations. Petitioners therefore sought formal designation as "Bacon districts" and funding equivalent to that available to the Abbott districts, i.e., those in DFG I and J, the wealthiest grouping of districts.

By consent order of February 6, 1998, the matter was transferred to the Commissioner, with the December 1997 complaint serving as the basis for a petition of appeal to the Commissioner. In response to the Department's and Commissioner's motion to dismiss for lack of standing, the petition was amended to add several students attending some of the school districts and their parents.[3] The matters were then transmitted to the Office of Administrative Law (OAL) where they would be heard in bifurcated proceedings but *seriatim* and in two phases. The first phase of the hearing was to determine whether petitioners were "fully effectuating" the provisions of CEIFA designed to aid low-income districts. If petitioners successfully met the initial threshold by demonstrating they were using CEIFA funding appropriately, then the second phase would determine whether petitioners were "unable to provide a thorough and efficient system of public education ... notwithstanding that they have properly effectuated [CEIFA]." Before the hearings commenced, three districts—the Lower Township, Lower Cape May Regional and South River—withdrew from the matter.

---

[3] Specifically, the following individuals were added: Joshua Keavney, Shawn Riley, Christopher Ridgeway, Anthony Ridgeway, Jonathan Glass, Feashal Glass, Danielle Glass, Louis Gracia, Tina Gracia, and Zachary Gracia. Subsequently, Sandra Keaveney and her son were removed as petitioners and others were added, including Rosalie Bacon, individually and on behalf of G.P., Z.P., J.B., J.B., M.B., D.B. and Z.H.; Joseph Baruffi, individually and on behalf of J.B.; Elizabeth Cullen, individually and on behalf of T.C.; Edie Riley, individually and on behalf of S.R.; and Arnetta Ridgeway and Christopher Glass, individually and on behalf of J.G., F.G. and D.G.; as well as Commercial Township.

At the conclusion of the first set of hearings, the administrative law judge (ALJ) issued an initial decision dated December 26, 2000, in which he found that "each petitioning district has established by preponderance of the credible evidence that it is using CEIFA funding appropriately and is entitled to proceed to the next phase of hearing." On February 9, 2001, the Commissioner upheld the ALJ's initial decision, and further clarified that during the next phase, each district had to prove that educational deficiencies existed and that the deficiencies could not be remedied, under current law and funding levels, by different programmatic and fiscal choices.

The matter returned to the OAL for further proceedings as to the remaining seventeen school districts. Following the second set of hearings, on September 23, 2002, the ALJ concluded that five of the seventeen petitioning districts had proven that they were "special needs districts" and entitled to additional funding,[4] but that the remaining twelve districts did not.[5] On February 10, 2003, the Commissioner adopted in part and reversed in part the ALJ's initial decision, finding only one district—Salem City—met the standards for a "special needs" district that entitled it to extra funding, but that the remaining sixteen districts[6] had not demonstrated that CEIFA funding is insufficient to enable them to provide a thorough and efficient education.

A total of ten districts filed appeals with the Board,[7] however, the Commercial and Maurice River districts subsequently with-

---

[4] Buena Regional, Commercial, Fairfield, Salem City and Woodbine.

[5] Clayton, Egg Harbor City, Hammonton, Lakehurst, Lakewood, Lawrence, Little Egg Harbor, Maurice River, Ocean, Quinton, Upper Deerfield and Wallington.

[6] Buena Regional, Commercial, Clayton, Egg Harbor City, Fairfield, Hammonton, Lakehurst, Lakewood, Lawrence, Little Egg Harbor, Maurice River, Ocean Township, Quinton, Upper Deerfield, Wallington and Woodbine.

[7] Those districts are: Lakewood; Buena Regional; Clayton; Commercial; Egg Harbor City; Fairfield; Lakehurst; Lawrence; Maurice River; and Woodbine.

drew their appeals. On January 4, 2006, the Board issued its final decision, which is the subject of this appeal.

In its decision, the Board first examined the education provided by, and the socioeconomic conditions present in, each of the Bacon districts, and relied on the ALJ's factual findings "to evaluate the adequacy of the educational opportunity being provided under CEIFA to the students in the [Bacon] districts individually and as a group and to the students in the broader category of school districts represented in this litigation by the [Bacon] districts— non-urban districts in [DFGs] A and B."

From the evidence of record, the Board concluded "that the students of these districts are not being afforded a thorough and efficient education." Moreover, the Bacon districts did not "offer an adequate breadth of programming;" art, music, media, library, world language and adequate science labs were either "inadequate ... insufficient .... nonexistent .... [or] not available." The Bacon districts also lacked other important resources such as child study teams, drug counseling, and alternate education programs. The Board further remarked that while "every child is entitled to a chance to excel," those chances were "sadly limited" in the Bacon districts.

The Board also recognized that the children in these districts had "special needs arising from the socioeconomic conditions in the districts." In fact, the Board concluded that "the conditions under which these students live mirror[ed] those of the students in the Abbott Districts, which in some cases are only blocks away." The Board then described the conditions in each of the Bacon districts and concluded that their students were not receiving an adequate education. Specifically, the Board could not "accept as adequate the education being offered by the [Bacon] districts ...

---

Lakewood's appeal was limited to the Commissioner's determination that the district must use all of its available funds for educational programming, including monies that it is using to support courtesy busing, before it can claim that it is entitled to status as a "special needs" district.

whether we judge adequacy in terms of student performance or educational inputs." This was true even though under CEIFA the Bacon districts had received more fiscal resources than they had in the past.

In sum, the Board concluded that

despite the gains made under CEIFA, its implementation has not resulted in the provision of a thorough and efficient education to the students of the districts involved in this appeal either in terms of absolute adequacy or in comparison with the wealthier suburban districts. We have also concluded, as did the Court in *Abbott II,* that a new approach is needed if the students of these districts are to be afforded an educational opportunity that satisfies the mandate of the New Jersey Constitution. However, our conclusions in this regard do not lead to the relief that the [Bacon] districts are seeking.

Having found the educational opportunity in the Bacon districts inadequate, the Board then addressed the remedy. Recognizing that CEIFA, as implemented, has failed to insure the students in the Bacon districts a "thorough and efficient" education, yet mindful of its own lack of jurisdiction to declare the act unconstitutional, the Board went on to recommend an approach that would address its concerns.

In doing so, the Board rejected the idea "that merely providing the [Bacon] districts with the same fiscal resources that are provided to the Abbott [d]istricts will ensure that the students in these districts are in fact afforded the educational opportunity to which they are entitled." While the Bacon districts were poor, they were rural, not urban. The Board therefore found "a unique set of circumstances that are different from those confronting the poor urban districts." Further, each Bacon district was confronted with its own peculiar set of circumstances, and therefore "different approaches will be required than those utilized in poor urban districts if the deficits in the education now being provided by the [Bacon] districts are to be corrected." Nevertheless, the Board did find that the students in the Bacon districts were "no less deserving than their counterparts in the urban districts in [DFGs] A and B" and have the same "right to adequate facilities, libraries and science labs." Further, the Bacon districts faced "conditions every bit as daunting as those in the Abbott districts."

The Board believed that a "systemic approach" was required to ensure that students in the rural Bacon districts received their constitutionally mandated education, and noted that it was unclear whether CEIFA, if properly implemented and funded, would have afforded the students in those districts a constitutionally appropriate education. The Board determined that "the starting point for remedying the educational deficit shown by the record is to assess the educational needs of the students in each district and identify the approaches that will effectively address those needs."

Therefore, the Board directed that:

under the Commissioner's supervision, the Department of Education begin immediately to develop a design for a needs assessment to be performed in each of the districts involved in the litigation before the Commissioner. In addition to assessing the adequacy of the educational inputs and programming currently being provided, we direct that the design proposed to us include elements that will identify the unique educational needs of the students in those districts requiring additional programs to address them. We direct that the Commissioner present her proposed design to the State Board by our February 1, 2006 public meeting and that she include in her proposal a timetable for conducting the needs assessment that gives priority to the [Bacon] districts.[8]

Apart from the needs of the individual Bacon districts, the Board further found systemic deficiencies in the implementation of CEIFA statewide, namely that students in other districts not involved in the litigation were also suffering from educational inadequacies. After finding that CEIFA had resulted in a fragmented public school system that did not ensure a thorough and efficient education for all students, the Board concluded that a re-examination of the entire educational system was required. In this respect, the Board found that it "[was] time to abandon [its] reliance on money as a surrogate for either educational equity or adequacy." Therefore, the Board directed

[8] The Department was also directed to undertake a thorough review of the five districts that the Commissioner concluded were not SNDs, but which he found were entitled to specific evaluations and interventions (i.e., Buena Regional, Commercial, Fairfield, and Woodbine, together with Salem City, which was included as an Abbott District).

the Commissioner to examine and analyze the operation of the current system on a statewide basis and to provide the State Board with her recommendations as to the educational components essential to the establishment of a unified system for public education. We further direct that she present her findings and recommendations to the State Board by its March 1, 2006 meeting.

The Board concluded that the legislative and executive branches would have to be involved in any systemic change of the State's educational system. The Board's decision constituted a final agency action, even though it "retain[ed] jurisdiction over implementation of the decision."

### (III)

Certain developments in the wake of the Board's final decision are relevant to this appeal.[9] Addressing the five school districts for which specific evaluations and interventions were required, the Commissioner, in a May 26, 2006, report, concluded that:

[u]pon review of these matters with the county superintendents of the counties involved, it was determined that in each case the county superintendent had reviewed the district budget to ensure that a thorough and efficient education could be provided to the students in the district within the budget that had been submitted to the State. In every case, the county superintendent had made such a finding and no further action was taken by the former Commissioner at the time or the county superintendents.

The Commissioner, however, failed to design and conduct a needs assessment of each appellant district as ordered by the Board in order to determine whether the rural Bacon districts had the same deficiencies and needs as the urban Abbott districts. Instead, the Commissioner, preferring the overall systemic change

---

[9] The original appellants were: Buena Regional; Clayton; Commercial; Egg Harbor City; Fairfield; Lakehurst; Lakewood; Lawrence; Maurice River; Woodbine; Hammonton; Little Egg Harbor; Ocean; Quinton; Salem City; Upper Deerfield; and Wallington. However, we later granted the Department's motion to dismiss the appeal as to the two school district that withdrew their appeal: Commercial and Maurice River; and the seven school districts that never appealed to the Board: Hammonton, Little Egg Harbor, Ocean, Quinton, Salem City, Upper Deerfield, and Wallington. Thus, the remaining appellants are the Buena Regional, Clayton, Egg Harbor City, Fairfield, Lakehurst, Lakewood, Lawrence, and Woodbine districts.

suggested by the Board, and not the piecemeal, fragmented approach engendered by individual assessments of the Bacon districts, recommended awaiting executive and legislative action on a new funding formula for educational aid then being addressed by the Administration. According to the Commissioner, implementation of a new statewide school monitoring system would allow the Department to work collaboratively with school districts on areas that required attention and with the Bacon districts specifically in evaluating their programs, thereby allowing those districts to identify areas of weakness which the Department could then address.

In sum, the Commissioner concluded that

[t]he [Corzine] administration has made clear its commitment to equitable school funding and the needs of the *Bacon* districts as well as all others will be addressed in that process. Therefore, the best course of action for everyone concerned is to await the development and implementation of the new funding formula as well as the implementation of [the new statewide school monitoring system]. These changes, by themselves, could rectify the Board's concerns that led to its request for district assessments in this matter.

Subsequently, a report issued by a Special Session Joint Legislative Committee recommended a new system for financially supporting the State's schools. The Department responded by forming three panels to identify the resources necessary to ensure a thorough and efficient education; once the resources were identified, their costs could be calculated. Those base cost figures could then be adjusted to calculate the costs of serving those students with special needs. Additional recommendations regarding a district's obligation to share in those costs, and the services that should be provided to DFG A and B schools (i.e., preschool and full-day kindergarten) were also made.

In response to these efforts and subsequent to oral argument in this matter, the School Funding Reform Act of 2008, *L.* 2007, *c.* 260(Act), was enacted on January 13, 2008. The Act repealed CEIFA's funding mechanism and replaced it with a new formula.[10] *Ibid.* Generally, the Act requires the Commissioner to establish a

---

[10] References to the "Abbott districts" have been deleted in the Act.

"base per pupil amount," which is the cost per elementary school student of providing the "core curriculum content standards" necessary for a thorough and efficient education. *Id.* § 4(b)(1). A school district's base cost is then established by multiplying the base per pupil amount by the district's weighted enrollment. *Id.* §§ 4(a)-(b), 8(a)-(b). The base cost is then adjusted, relevant here, to reflect the additional costs associated with educating "at-risk students," i.e., those living in poverty,[11] and to reflect county differences in the cost of educating a district's students. *Id.* §§ 2, 10, 11. The adjusted district base cost is referred to as the district's "adequacy budget." *Id.* § 9.

Under the Act, a "local share" is calculated for each school district's adequacy budget, based on the district's property and personal income wealth. *Id.* § 10(a). State "equalization aid," the wealth-equalized portion of a district's State aid, is provided to support that portion of the adequacy budget that cannot be met by the local share. *Id.* §§ 5(d)(1), (11).

The Act further provides State aid for significantly expanded early childhood programs including full-day preschool for three- and four-year olds in the poorest districts, i.e., those in DFGs A and B. *Id.* § 12(a). A district may also receive "adjustment aid," to ensure that for the 2008–2009 school year every district receives the greater of either the State aid amount as calculated under the Act or 102% of the State aid received in the 2007–08 school year. *Id.* at § 16(a)(1).

Finally, the Act amends existing school facilities funding law, in part by establishing SDA districts (essentially the former Abbott districts) whose facility projects will be fully funded by the State.[12] *Id.* § 41.

---

[11] "At-risk pupils" are defined as those living in households with household income at or below the poverty level "multiplied by 1.85." *L.* 2007, *c.* 260, § 3.

[12] *Section 41* of the Act provides that the New Jersey Schools Development Authority established by *N.J.S.A.* 52:18A–237, "shall undertake and the [state] financing authority shall finance the school facilities projects of SDA districts."

Simply stated, under the Act, the Department will calculate how much it costs to meet the constitutional mandate of affording every student in this State a thorough and efficient education. The State then bases its share of the requirement by the wealth of a district; poorer districts will get a higher percentage of their educational budget from the State. There is one formula for allocating money—simplified compared to the current one, but still complex—that applies to each of the State's 618 school districts. Under the new formula, the number of low income students in a district will be a major factor.

### (IV)

Having demonstrated a constitutional deprivation unchallenged by the Department as well as an inability through local taxation to fill in the gaps created by CEIFA's inadequate funding, appellants insist on appeal that the only proper remedy for the educational deficiencies in the record is to grant them status comparable to Abbott districts and award them the same financial resources provided to their urban counterparts, i.e., parity funding, facilities funding and universal preschool. However, given our traditional deference to legislative solutions, recent developments in the aftermath of the Board's final decision—most notably the enactment of new legislation—and the incomplete record occasioned by the Commissioner's failure to carry out the Board's preliminary directives, we are not convinced the ultimate remedy suggested by appellants is constitutionally compelled at this time.

The Court has historically acknowledged its preference for legislative action to remedy constitutional violations and in cases of this sort has allowed the State to proceed with a legislative solution rather than ordering the type of immediate remedial relief granted in *Abbott IV* and *Abbott V,* and sought here. *See, e.g., Robinson v. Cahill,* 63 *N.J.* 196, 197–98, 306 *A.*2d 65 (*Robinson II* ), *cert. denied,* 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973); *Robinson v. Cahill,* 69 *N.J.* 449, 468, 355 *A.*2d 129 (1976) (*Robinson V* ); *see also Abbott II, supra,* 119 *N.J.* at 384–85, 575

*A.*2d 359; *Abbott III, supra,* 136 *N.J.* at 446–47, 643 *A.*2d 575. In other words, in *Abbott II,* after concluding that the Public School Education Act of 1975 was unconstitutional as applied to the "poorer urban districts" (Abbott districts), the Court deferred to the executive and legislative branches to determine which districts are Abbott districts and to amend the 1975 Act, or enact new legislation, so as to assure that the Abbott districts' educational funding was substantially equal to the DFG I and J districts. 119 *N.J.* at 385–89, 575 *A.*2d 359. In *Abbott III,* the Court found the Legislature's response to *Abbott II,* QEA, to be unconstitutional but, again, provided the executive and legislative branches with an opportunity to enact legislation that provided the Abbott districts with educational funding substantially equal to the DFG I and J districts. *Abbott III, supra,* 136 *N.J.* at 446–48, 643 *A.*2d 575.

Even in *Abbott IV,* where it was held that the Legislature's response to *Abbott II* and *Abbott III*—CEIFA—was unconstitutional as applied to the Abbott districts, the Court ordered an interim judicial funding remedy only after it was "[p]resented with no alternative remedy by either the plaintiffs or the State, and without a realistic alternative arising out of the new act itself," and found an "absence of any real prospect for genuine educational improvement in the . . . [Abbott] districts." *Abbott IV, supra,* 149 *N.J.* at 202, 693 *A.*2d 417. Recognizing that "[t]he judicial funding remedy . . . is likely to be approaching inutility[,]" *ibid.,* the Court was confronted with balancing "the inescapable reality of a continuing profound constitutional deprivation that has penalized generations of children . . . [against] an alternative, 'wait and see' approach. That approach usually is both prudent and preferred in constitutional jurisprudence, and the Court has taken that approach in the past." *Id.* at 201–02, 693 *A.*2d 417.

Clearly, the interim measure was ordered only as a last resort:

The Legislature has known since July 1994, when we decided *Abbott III,* that increased funding would have to be achieved by the 1997–1998 school year. That 1994 order, in turn, was necessitated by the Legislature's failure to comply with our 1990 order calling for remedial relief. Thus, the State has had seven years to

comply with a remedy intended to address, albeit partially, a profound deprivation that has continued for at least twenty-five years.

[*Id.* at 197–98, [693 *A.*2d 417].]

Significant for present purposes, in fashioning such judicial relief, the Court recognized that additional funding alone could not solve the State's educational problems, and that "[o]nly comprehensive and systemic relief will bring about enduring reform." *Id.* at 202, 693 *A.*2d 417.

Here, of course, unlike *Abbott IV*, an alternative remedy promising "comprehensive and systemic relief" as well as a more specific approach to the particularized needs of the litigants in this matter have been offered. Whether the legislation just recently enacted delivers on that promise, and more specifically, responds to the individualized, unique circumstances of the Bacon districts, remains to be seen. A seemingly effective first start for remedying the educational deficits shown by this record has already been identified by the Board in its final decision in this matter. To that end, the Board directed the Commissioner to focus on the unique set of circumstances confronting students of these poor rural districts that distinguish them from their urban counterparts; assess the special educational needs of the students in each of the Bacon districts; and identify the approaches that will effectively address these needs. As the Board found, such an assessment is a prerequisite to ensuring that adequate resources, including fiscal resources, are provided and appropriate accountability for their uses guaranteed.

We find no warrant for interference with this approach at this time, particularly in light of the recent legislation enacted just one month ago. The requirement of a needs assessment to identify the particular educational needs of the Bacon district students is obvious given that they "face a unique set of circumstances that are different from those confronting the poor urban districts." As the Board concluded, "different approaches will be required than those utilized in poor urban districts if the deficits in the education now being provided by the [Bacon] districts are to be corrected."

Despite the evident soundness of such an approach, the Commissioner, contrary to the Board's directive, failed to perform this critical needs assessment, or even design its format, opting instead to rely on the prospect of comprehensive reform legislation, which has since become a reality. But, contrary to the position implicit in the Commissioner's inaction, we do not view pursuit of systemic, overall change and the conduct of a more particularized needs assessment to be either incompatible or mutually exclusive. In fact, the two approaches appear complementary, especially given the Act's stated preference for a systemic remedy that emphasizes the characteristics of the student population and the individual district's ability to pay; in other words, comprehensive reform that stresses educational funding that is student-based, not geographically directed. Thus, we perceive no sound reason why the Board's earlier directive to the Commissioner should no longer be enforced. Nor do we consider enforcement of the Board's order directing the Commissioner to design and conduct a needs assessment to constitute undue meddling with executive and legislative action in this area. On the contrary, it is the very least our constitutional duty demands. After all, constitutional violations must be remedied in a timely fashion. *Abbott IV, supra,* 149 *N.J.* at 201–02, 693 *A.*2d 417; *see also Lewis v. Harris,* 188 *N.J.* 415, 463, 908 *A.*2d 196 (2006).

Indeed, it would appear that a needs assessment of the Bacon districts is necessary to determine whether those needs identified by the Department will be met by the Act's new funding formula. Consequently, we direct the Commissioner to comply with the Board's final decision and proceed forthwith to design and perform a needs assessment of each of the Bacon districts, to be completed within six months, and based thereon, to further determine whether, in light of the proven educational deficits already found by the Board, the Act's remedial measures afford students in the Bacon districts the thorough and efficient education to which they are constitutionally entitled. In its assessment of appellants' needs and the Act's remedial impact thereon, the Department shall afford appellants a full and fair opportunity to

be heard. And, of course, appellants shall also have the right to appeal the Commissioner's determination to the Board, and ultimately to this court.

Remanded for further proceedings consistent with this opinion.